******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RICARDO SWILLING
## (AC 40234)

Alvord, Keller and Beach, Js.

*Syllabus*

Convicted of the crimes of kidnapping in the first degree, home invasion and assault in the second degree, and of being a persistent dangerous felony offender, the defendant appealed. The defendant, who had paid the victim to stay at her apartment, allegedly had engaged in a violent physical struggle with the victim in the apartment over the course of two days, during which he held her hostage in the apartment, attempted to strangle her, stabbed her with kitchen knives, and punched and kicked her. When the victim was able to escape, she went to the apartment of a neighbor, where she called 911. On appeal, the defendant claimed, inter alia, that the trial court violated his due process right to a fair trial by questioning two witnesses during the state's case-in-chief and improperly permitted the victim to make an in-court identification of him in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of him. *Held*:

1. The defendant could not prevail on his unpreserved claim that the trial court violated his due process right to a fair trial, which was based on his assertion that the court became an advocate for and suggested that it favored the state when it questioned the victim and the neighbor during the state's case-in-chief: the trial court did not compel the victim to identify the defendant as the perpetrator, reflect bias in favor of the state or act unreasonably when it asked her a single question about the identity of the defendant after she had made an ambiguous in-court identification of him, and the present case did not present a situation in which the court advocated in favor of a particular verdict, suggested that a particular witness was credible, or otherwise suggested that it believed or disbelieved any particular version of events; moreover, the court's questioning of the neighbor reflected a reasonable attempt to clarify his ability to make an identification of someone in the courtroom, as well as the nature of the state's inquiry, the court's brief inquiry protected the defendant's right to ensure that the jury had before it facts, rather than confusion, and that the facts were presented to the jury in an understandable manner, and the court's jury instructions conveyed to the jury that the court did not have a role in the fact-finding process and did not have an opinion concerning the outcome of the trial.

2. This court found unavailing the defendant's unpreserved claim that his due process rights were violated when the trial court permitted the victim to make an in-court identification of him in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of him: although the state failed to request permission from the trial court to conduct a first time in-court identification of the defendant, as required under the newly created rule applicable to first time in-court identifications set forth in *State* v. *Dickson* (322 Conn. 410), that rule applied to the parties in that case and to all pending cases, the defendant's appeal was pending at the time *Dickson* was decided, which meant that the suggestive in-court identification already had occurred, and, thus, the defendant was not necessarily entitled to relief arising from the state's failure to abide by a procedural rule that was not in existence at the time of the defendant's trial, and given that there were no factual disputes with respect to the victim's familiarity with or ability to identify the defendant, or with her ability to observe, recall and narrate facts concerning the person who allegedly assaulted her, and, despite the fact that the record was silent with respect to any out-of-court identification made by the victim, her in-court identification of the defendant was permissible without adherence to the procedural safeguards in *Dickson* where, as here, there was no showing of harm.

3. The defendant could not prevail on his claim that the trial court abused its discretion in admitting evidence of his prior felony convictions, which was based on his assertion that the convictions were too remote in time and were more prejudicial than probative; the defendant's argument

that the convictions were too remote in time was not persuasive, as the defendant was released from confinement within ten years of the time of his trial, he was unable to demonstrate that the trial court's determination that the felony convictions were relevant in an assessment of his credibility was improper, and there was no reason to doubt that the jury followed the limiting instructions given by the court immediately following the admission of the evidence and during the court's charge.

4. The trial court did not abuse its discretion in admitting into evidence under the spontaneous utterance exception to the hearsay rule a recording of the 911 call made by the victim:

a. The trial court properly determined that the 911 recording fell within the spontaneous utterance exception to the hearsay rule; that court properly considered the manner in which the victim spoke in its review of all of the relevant facts surrounding her statements and properly determined that the victim's declarations were made under circumstances that negated the opportunity for deliberation, contrivance and misrepresentation by the declarant, as the 911 call occurred within minutes after the victim fled from her apartment while she was under the influence of a startling event following an ordeal that reasonably would be expected to have created a high degree of emotional disturbance, and although some of the victim's statements were made in response to questions posed to her by the 911 dispatcher, many others were made spontaneously, the circumstances reflected a lack of forethought by the victim in responding to the questions, and there was ample evidence to support the court's finding that the victim's statements were spontaneous.

b. The trial court did not abuse its discretion in failing to conclude that the admission of the 911 recording was unduly prejudicial; the defendant's claim that the 911 recording was prejudicial because it was cumulative was not supported by the record, and the victim's strong language in the recording that the defendant had tortured and kidnapped her was not any more inflammatory than, and was not likely to have aroused the jury's emotions any more than, her testimony concerning the defendant's actions, which included beating, choking, kicking and repeatedly stabbing her.

5. The defendant could not prevail on his claim that the cumulative effect of the trial court's alleged errors deprived him of his right to a fair and impartial trial; the claim was not adequately briefed, as it consisted of a legal assertion and was devoid of analysis of facts or law, and even if the claim was considered on its merits, it lacked merit in light of this court's determination that no error existed with respect to the defendant's claims on appeal.

Argued November 15, 2017—officially released April 3, 2018

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of kidnapping in the first degree, assault in the first degree and home invasion, and, in the second part, with three counts of being a persistent dangerous felony offender, brought to the Superior Court in the judicial district of Waterbury, where the first part of the information was tried to the jury before *K. Murphy, J.*; verdict of guilty of kidnapping in the first degree, home invasion and the lesser included offense of assault in the second degree; thereafter, the defendant was presented to the court on conditional pleas of nolo contendere to two counts of being a persistent dangerous felony offender in the second part of the information; judgment of guilty in accordance with the verdict and pleas, from which the defendant appealed. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *William A. Adsit*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Marc G. Ramia*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Ricardo Swilling, appeals from the judgment of conviction, rendered following a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), home invasion in violation of General Statutes § 53a-100aa (a) (2), and assault in the second degree in violation of General Statutes § 53a-60 (a) (2).[1] Additionally, following the defendant's pleas of nolo contendere, the defendant was convicted of two counts of being a persistent dangerous felony offender in violation of General Statutes § 53a-40 (a) (1), as alleged in part B informations that were related to the kidnapping and home invasion charges.[2] The defendant claims that (1) the trial court violated his due process right to a fair and impartial trial by questioning two witnesses during the state's case-in-chief, (2) the court improperly permitted the victim to make an in-court identification of him absent a showing that she previously had made a nonsuggestive out-of-court identification of him, (3) the court improperly admitted evidence of his prior felony convictions, (4) the court improperly admitted a recording of a 911 call made by the victim, and (5) the cumulative effect of the court's errors deprived him of his right to a fair and impartial trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In December, 2014, the victim, Barbara Wilson, resided in an apartment complex in Waterbury in a unit that was leased to her and her daughter. The living room and the kitchen were located on the first floor of the unit, and three bedrooms and a bathroom were located on the second floor of the unit. The victim had a practice of letting others rent space in her apartment, at a usual rate of $150 per week. The victim first met the defendant in 2013. In early December, 2014, a mutual friend of the victim and the defendant, identified in the record as "Luis," appeared at the victim's residence with the defendant. Luis asked the victim if the defendant could stay at her apartment for a few days. Initially, the victim did not consent to Luis' request and the two men departed. Later that day, however, the defendant appeared once more at the victim's apartment to discuss the matter further. The defendant gave the victim $20 and some brandy.

During this second meeting, the victim agreed to let the defendant pay her to stay at the apartment. The defendant explained that he worked overnight and would come and go from the residence as necessary. The victim, who was almost always at home, did not give the defendant a key to the apartment, but simply let him in whenever he knocked on the door. The victim had only two keys for the residence, one which she kept and another that was kept by her parents.

The defendant stayed at the apartment over the course of two weeks in December, 2014, sometimes spending the overnight hours there. He frequently came to the residence to sleep either in an unfurnished bedroom or on a sofa. He paid the victim $70. During the time that the defendant spent at the apartment, he was never left alone there and, prior to the events at issue, when the defendant was present at the apartment, there was always one or more third parties present along with the victim. The defendant did not keep any personal belongings at the apartment, but always carried his belongings with him in a duffel bag.

On December 24, 2014, at approximately 10 a.m., the victim was at the apartment with her boyfriend, Eddie Ortiz, when the defendant arrived at the apartment. The defendant asked for a ride. Soon thereafter, Ortiz drove the defendant to a bus stop located near a liquor store. Then, Ortiz drove the victim to a store. At approximately 11 a.m., he drove her back to her apartment. The victim entered the apartment alone and locked the door.

At approximately 11:30 a.m., the victim observed the defendant standing near the front door inside of her apartment. The victim asked the defendant how he gained access to the apartment. What followed was a violent physical struggle between the victim and the defendant. The defendant wrapped his hands around the victim's throat and began to strangle her. The victim was experiencing difficulty breathing, and she managed to pry the defendant's hands off her. The victim fled the apartment by means of the front door, but the defendant pursued her from behind, dragged her back inside the apartment, and resumed strangling her.

The victim physically struggled with the defendant and, eventually, the victim and the defendant were on the floor of the kitchen. The victim was able to twist her body to break free of the defendant's grasp, at which time she got back on her feet and reached a rear door inside the kitchen. The defendant cornered the victim between a stove and a sink. At this point in time, the defendant grabbed two knives that were on top of a nearby microwave oven and began to stab the victim repeatedly while she was standing in front of the stove. While the defendant was stabbing her and yelling at her, the victim raised her hands to protect her face. The victim sustained multiple stab wounds and was bleeding.

There was a knock at the victim's front door. The defendant told the victim that if she said anything, he would kill her. He pushed the victim upstairs to the bathroom and forced her to stand in a bathtub. He threatened her with a knife until the knocking ceased.

The defendant led the victim to her bedroom and continued to yell at her. Among the things that the defendant stated was that if he was not going to have

a good Christmas, neither was the victim. The victim partially undressed and began to tend to her wounds with a T-shirt. She was permitted to go into the bathroom to wash some of the blood off her body and to put on a clean shirt. While the victim was cleaning her body, the defendant remained in the bathroom and threatened her with a knife. The defendant noticed that a knife blade had broken off during the attack and remained stuck in the victim's arm. The defendant told the victim that he almost felt "some kind of sympathy" for her and he removed the broken blade from her arm.

The defendant, still holding a knife, led the victim back into her bedroom, where he remained with the victim for several hours. He yelled at the victim and repeatedly used his cell phone, but apparently was unable to reach anyone on his cell phone. Additionally, the defendant watched a movie and consumed alcohol during this time.

At approximately 5 or 6 p.m., there was another knock on the victim's front door. The victim told the defendant that it was likely that her daughters were at the door and that, if he let them in, she would not say anything about what had occurred and that he could get a ride somewhere. The defendant refused, and he warned her to remain quiet. When the knocking stopped, the victim asked the defendant for a cigarette. The defendant approached the victim and punched her in the face. The defendant and the victim shouted at one another and, after using his cell phone, he approached the victim, who was sitting on a bed, kicked her, and pushed her into a wall. The defendant continued to yell things that were incomprehensible to the victim and continued to threaten the victim. For example, he told the victim that he found more liquor, he was ready for "round two," and that she was "really going to get it." The victim, under the constant supervision of the defendant, remained in the bedroom with the defendant until approximately 4 a.m., the following day.

At that point in time, the defendant ordered the victim to prepare chicken for him to eat. He escorted her to the kitchen where she complied with his request. The defendant forced the victim to sit next to him in the living room while he ate the meal she had prepared, but he did not permit her to eat or drink anything. The defendant warned the victim not to "make a move."

At approximately 6 or 7 a.m., the defendant escorted the victim back upstairs. The victim, who had barely slept the night before, felt weak and sat on the bed. The defendant stabbed her in the right arm with a knife. The defendant repeatedly yelled at the victim. The victim asked the defendant if she could return to the bathroom to tend to her wounds, but he refused this request. Throughout the day, the defendant continued to consume alcohol and watch television. Although he did not do so previously during this incident, the defendant

eventually fell into a deep sleep.

At approximately 8 p.m., the victim sensed an opportunity to rush past the sleeping defendant and make her way out of the apartment. She quickly exited her apartment and approached the apartment of a neighbor, Luis Matos. The victim knocked frantically on Matos' door. Matos let the victim inside of his apartment where she called 911. Police and emergency medical personnel arrived at the scene shortly thereafter. The victim was transported to a nearby hospital where she received treatment for her many stab wounds.

Waterbury police Officer Brian LaPerriere was one of several police officers to respond to the scene. When he encountered the victim, her clothing was covered in dried blood and several of her stab wounds were apparent to him. After hearing the victim's version of events, the officers entered the victim's apartment through a rear window on the second floor. They observed bloodstains throughout the residence and bloody knives on the floor of the kitchen and bedroom. While he was in the process of searching the apartment, LaPerriere discovered the defendant hiding in a closet on the first floor. The defendant complied with LaPerriere's commands, and provided the officers with his name and his street name, Apollo. The defendant stated to the police that he "was in some shit." Additional facts will be set forth as necessary in our analysis of the defendant's claims.

I

First, the defendant claims that the court violated his due process right to a fair and impartial trial by questioning the victim and Matos during the state's case-in-chief. We disagree.

The following two events that occurred during the trial are the subject of the present claim. The first occurred during the state's direct examination of the victim. By way of relevant background, the victim testified that she was familiar with the defendant prior to the events at issue. She identified the person that she allowed to stay in her apartment as "Ricardo Swilling," who had a street name of "Apollo," and described his arrangement with her regarding the use of the apartment. Absent objection, the following colloquy occurred:

"[The Prosecutor]: . . . And is [the defendant] present in court today?

"[The Victim]: Yes.

"[The Prosecutor]: Can you please point to him and describe what he's wearing?

"[The Victim]: He's right over here. He [has] a gray suit on.

"The Court: With the tie or without the tie?

"[The Victim]: I can't see over the screen. No tie.

"The Court: All right. The record can reflect identification of the defendant."

Absent objection, at the conclusion of the state's examination of the victim, during which she described the defendant's conduct during December 24 and December 25, 2014, the following colloquy occurred:

"[The Prosecutor]: And the individual who stabbed you on [December 24 and December 25] of 2014, is he present in court today?

"[The Victim]: Yes, he is.

"[The Prosecutor]: The person that did not allow you to leave your apartment?

"[The Victim]: Yes, he is present."

Following an additional brief inquiry of the victim by the state, the prosecutor stated that he did not have any further questions for the victim. The following colloquy followed:

"The Court: Before we take the recess . . . you said that person is in the courtroom and it may seem obvious, but is that the person you've identified before as [the defendant]?

"[The Victim]: Yes."

Second, during the state's direct examination of Matos during its case-in-chief, Matos testified in relevant part that, on December 25, 2014, the victim appeared at his door, he provided assistance to her, and police and emergency medical personnel were summoned to the scene. Matos testified that the victim explained to him what had happened to her. There is no indication in Matos' testimony that he knew the defendant prior to the events at issue or had any interaction with him following the events at issue. He testified that, following the victim's arrival at his apartment on December 25, 2014, he went outside to see "where was the guy at." The following colloquy then occurred:

"[The Prosecutor]: And when you were outside . . . did you see anything?

"[The Witness]: No. The only time I seen him was when the officer ran behind her house; that's when he locked the door on the house.

"[The Prosecutor]: Okay. When you say, 'he,' who do you mean?

"[The Witness]: The guy. When the officer went to the house to see if he was still there, the guy ran back to the house, he locked the door.

"[The Prosecutor]: So . . . you saw an individual outside of [the victim's] apartment?

"[The Witness]: No. I didn't get to see him, but the

officer ran and he seen him locking the door.

"[The Prosecutor]: Okay. And which door did you see him lock or go into?

"[The Witness]: The back door of [the victim's] house.

"[The Prosecutor]: Okay. And were you able to see that individual?

"[The Witness]: No. I didn't get to see him. I seen him after he got arrested and everything, then I seen him. But I never seen that guy before.

"[The Prosecutor]: Now, the person that you saw go back into the house, was that the same person you saw in police custody later?

"[The Witness]: Yup.

"[The Prosecutor]: Okay. And is that person in court here today?

"[The Witness]: I don't know. I have no idea.

"[The Prosecutor]: If you take a look in the courtroom, can you let us know if you recognize anybody?

"[The Witness]: That guy.

"[The Prosecutor]: Can you describe what he's wearing?

"[The Witness]: He's got a gray sweater.

"The Court: What color shirt is he wearing?

"[The Witness]: He's wearing a white shirt with like blue—

"The Court: No, I'm talking about right now.

"[The Witness]: Right now, he's got a blue on, with dreads.

"The Court: Okay.

"[The Prosecutor]: I'll ask [that] the record reflect he did point in that direction.

"The Court: He did. The record can reflect he pointed in the direction of the defendant, but—Mr. Matos, let me just make it a little easier here. You pointed over in that direction. Do you see the person that the police took into custody that night here in the courtroom?

"[The Witness]: Well, it looks, the only one that look familiar is him.

"The Court: Okay. And what color shirt is he wearing, that's all I'm asking you.

"[The Witness]: Blue.

"The Court: Blue. Okay. There is really no one over there with a blue shirt that I could see.

"[The Witness]: I'm not a color, you know—

"The Court: Okay. All right. That's enough. That's

fine. Go ahead. Continue your questioning."

At the time of trial, the defendant did not raise any objection to the court's questioning of the victim or Matos. On appeal, the defendant claims that the court violated his due process right to a fair trial[3] by questioning the victim and Matos directly, thereby interfering with and aiding the state's direct examinations of the victim and Matos. The defendant argues that, by questioning these witnesses as it did, the court abandoned an impartial posture, became an advocate for the state, intruded on the role of counsel, and suggested to the jury that it favored the state's case. The defendant argues that the court asked the victim a leading question that effectively compelled her to identify the defendant as the perpetrator of the violence she described in her testimony. The defendant argues that, during its colloquy with Matos, the court "essentially pressed Matos to identify [the] defendant" as the man he observed outside of his apartment. According to the defendant, "Matos' failure to identify [the] defendant made [the court's] interference even more improper. It worked to disadvantage [the] defendant's case in that it tended to convey to the jury . . . [the court's belief that the] defendant was the perpetrator, or at least strongly suggest[ed] that the jury should infer this, even though there was nothing in evidence prior to [the victim's] compelled identification in response to the court's leading question that suggested [the] defendant was [the person who the victim knew to be] 'Apollo.' " The defendant argues that absent the court's interference with the presentation of evidence, the record is devoid of sufficient evidence from which the jury reasonably could have found that the state had satisfied its burden of demonstrating the essential element of identity, that is, that he was the perpetrator of the crimes at issue.

The defendant requests review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4] As modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), the *Golding* doctrine provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40. "The defendant bears the responsibility for provid-

ing a record that is adequate for review of his claim of constitutional error. . . . The defendant also bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . Finally, if we are persuaded that the merits of the defendant's claim should be addressed, we will review it and arrive at a conclusion as to whether the alleged constitutional violation . . . exists and whether it . . . deprived the defendant of a fair trial." (Citations omitted.) Id., 240–41.

We conclude that the claim is reviewable under *Golding* because the record is adequate to review the claim presented and the claim is of constitutional magnitude. We conclude, however, that the defendant cannot prevail under *Golding* because he is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.

"Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . Consistent with his [or her] neutral role, the trial judge is free to question witnesses or otherwise intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as [the trial judge] does not appear partisan in doing so. . . . Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts. . . .

"One of the chief roles of the trial judge is to see that there is no misunderstanding of a [witness'] testimony. The judge has a duty to comprehend what a witness says as much as it is [the judge's] duty to see that the witness communicates with the jury in an intelligible manner. A trial judge can do this in a fair and unbiased way. [The judge's] attempt to do so should not be a basis of error. Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 535–36, 864 A.2d 847 (2005); see also *State* v. *Bember*, 183 Conn. 394, 401, 439 A.2d 387 (1981).

"Whether or not the trial judge shall question a witness is within his sound discretion . . . [and] [i]ts exercise will not be reviewed unless he has acted unreasonably, or, as it is more often expressed, abused

his discretion. . . . The trial judge can question witnesses both on direct and cross-examination. . . . [I]t may be necessary to do so to clarify testimony as [the judge] has a duty to comprehend what a witness says . . . [and] to see that the witness communicates with the jury in an intelligible manner. . . . While no precise theorem can be laid down, we have held that it is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth . . . and [intervene] where the witness is embarrassed, has a language problem or may not understand a question." (Citation omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 652, 881 A.2d 1005 (2005); see also *State* v. *Velasco*, 253 Conn. 210, 237–38, 751 A.2d 800 (2000); *State* v. *Fernandez*, 198 Conn. 1, 12–13, 501 A.2d 1195 (1985). "The risk of constitutional judicial misconduct is greatest in cases where the trial court has interceded in the merits of the trial." *State* v. *Woodson*, 227 Conn. 1, 31, 629 A.2d 386 (1993).

Mindful of the foregoing principles, we turn to the court's questioning of each of the two witnesses at issue. As set forth previously in this opinion, the record reflects that the victim made an in-court identification of the defendant as the person she knew to be "Ricardo Swilling" or "Apollo," the person she permitted to stay at her apartment. Later, after the victim had testified with respect to the violent events of December 24 and December 25, 2014, she testified in response to the prosecutor's inquiry that the person who had stabbed her and who did not permit her to leave her apartment was "present" in the courtroom. It is abundantly clear from reviewing the victim's testimony that the person she referred to as "Ricardo Swilling" or "Apollo" was the person she believed to be the perpetrator of the crimes at issue. After eliciting this testimony with respect to the perpetrator's mere presence in the courtroom, however, the prosecutor did not ask the victim specifically to identify the defendant.

When the prosecutor indicated that he did not have any further questions for the victim, the court asked a single question of the victim. The court asked her if the person she had identified as the perpetrator of the crimes, and who was present in the courtroom, was the person she had previously identified as "Mr. Swilling." The court aptly observed that its inquiry seemed "obvious"—the victim already had identified the defendant to be "Ricardo Swilling," the person who was staying at her apartment, and she testified that this same person was the perpetrator of the crimes. Nonetheless, at the time of the court's inquiry the victim had made an in-court identification that was ambiguous. She merely had testified that the perpetrator of the crimes was present in the courtroom. Thus, although she made a second in-court identification, her identification was not clear, but left an ambiguity with respect to a critical

factual issue. In this circumstance, the court did not appear to be taking sides in the matter. It merely asked a single question that readily clarified the victim's testimony for the benefit of the court and the jury. We disagree that the court compelled the witness in any way, reflected any degree of bias in favor of the state's case, or acted unreasonably.

With respect to the court's inquiry of Matos, as is set forth previously in this opinion, it is clear that, with respect to whether Matos observed the perpetrator or was able to make an in-court identification of the defendant, the prosecutor did not present an intelligible narrative. Matos testified that he did not see anything when he went outside. Then, Matos testified that he saw "him" when a police officer ran behind the victim's house. The prosecutor asked Matos to explain, to which Matos testified that he saw "[t]he guy" run to the back of the victim's house and lock the door. When the prosecutor asked for further explanation as to whether Matos saw an individual outside of the victim's apartment, Matos testified "No. I didn't get to see him . . . ." Then, Matos testified that an officer saw someone locking a door at the victim's house. The prosecutor again asked if Matos was able to see this individual, to which Matos answered that he did not see him, but also that he saw him after he was placed under arrest.

Following this utterly confusing testimony, the prosecutor attempted to elicit an in-court identification of the defendant by Matos. The prosecutor asked Matos if the person that he observed reentering the victim's house was the same person that he observed later in police custody. Matos replied, "Yup." When the prosecutor asked Matos if he observed that same person in the courtroom, he replied, "I don't know. I have no idea." When the prosecutor asked Matos to look around the courtroom and "let us know if you recognize anybody," Matos replied, "[t]hat guy," and began to describe someone who was wearing a gray sweater.

The court asked Matos four questions, all of which sought clarification from Matos with respect to whom in the courtroom he was attempting to identify and whether that person was the man that he observed in police custody on December 25, 2014. The court asked Matos, three times, to clarify the clothing being worn by the person he was attempting to identify. The prosecutor had asked Matos to identify someone that he "recognize[d]"—an inquiry that was not pertinent to the issues before the jury and which possibly could have created confusion in the minds of the jurors. The court, in an obvious attempt to dispel any ambiguity with respect to who in the courtroom Matos was attempting to identify and why, asked Matos, "[d]o you see the person that the police took into custody that night here in the courtroom?" When Matos continued to reflect an inability to provide an intelligible identifica-

tion, the court ended the inquiry by stating, "[t]hat's enough."

Having reviewed the record carefully, we are persuaded that the court's questioning of Matos reflected a reasonable attempt to clarify both Matos' ability to make an identification of someone in the courtroom as well as the nature of the state's inquiry. It is clear from a review of the colloquy between the prosecutor, the court, and Matos that such clarification was needed. By making the brief inquiry of the witness that it did, the court did not do more than protect the defendant's right to ensure that the jury had before it facts rather than confusion. Stated otherwise, the court fulfilled its role of ensuring that the facts were presented to the jury in an understandable manner. Contrary to the defendant's characterization of the court's questions, the court did not reflect any bias in favor of the state's case or exert any influence on Matos to identify the defendant as the person he may or may not have seen on the night in question.

The present case does not present a situation in which the court advocated in favor of a particular verdict, suggested that a particular witness was credible, or otherwise suggested that it believed or disbelieved any particular version of events. The court's brief inquiries in the present case appear to have been directly tailored to address ambiguities that obviously existed in the questioning of the two witnesses at issue. The defendant argues that the court improperly assisted the state's case and infringed upon the role of counsel. Yet, as our case law reflects, judicial intervention in the form of questioning witnesses is proper when, as in the present case, such intervention is limited and is properly tailored to dispelling confusion in the mind of the court and the jury with respect to the nature of the evidence being presented by a party. Although it was the jury's function to evaluate the evidence, including any in-court identifications of the defendant, it was the court's function to clarify whether an in-court identification of the defendant by Matos, in fact, had occurred.

Additionally, we observe that during its charge, the court stated in relevant part: "You should not be influenced by my actions during the trial in ruling on motions or objections by counsel, or in comments to counsel, or in questions to witnesses, or in setting forth the law in these instructions. You are not to take my actions as any indication of my opinion as to how you should determine the issues of fact." Also, the court stated: "If by any remote chance you think I have an opinion in this case, I must tell you that you are wrong. I have no opinion in this case. I am, if you will, like the referee in a basketball game. I have no opinion as [to] how the matter should end. My job is to make sure that everybody plays by the rules and to explain the rules when necessary." These instructions unambiguously con-

veyed to the jury that the court did not have a role in the fact-finding process and did not have an opinion with respect to the outcome of the trial, thereby mitigating the danger that the jury might have considered the conduct at issue in this claim in the harmful manner suggested by the defendant.

For the foregoing reasons, we conclude that the court acted well within its discretion. The defendant has failed to demonstrate that a constitutional violation exists and deprived him of a fair trial. Accordingly, the claim fails under *Golding*'s third prong.

## II

Next, the defendant claims that the court improperly permitted the victim to make an in-court identification of him in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of him. We disagree.

In arguing that his due process rights were violated, the defendant relies solely on *State* v. *Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016), cert. denied, U.S.    , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), in which our Supreme Court held that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." The court explained: "[A]ny first time in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation. . . . Although we recognize that, when the witness could have identified the defendant in a nonsuggestive procedure, a first time in-court identification does not constitute an actual violation of due process principles, this court has an obligation to adopt procedures that will eliminate the risk that the defendant will be deprived of a constitutionally protected right by being identified in court by a witness who could not have identified the defendant in a fair proceeding. Indeed, it is well established that courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation. . . . In the present case, we conclude that the practice of allowing first time in-court identifications creates a significant risk of a due process violation and that the procedures that we adopt herein are more effective at preventing such violations, less costly and more in keeping with the legislative will than any other alternative." (Citations omitted; emphasis omitted.) Id., 426–27 n.11.

Our Supreme Court went on to explain that certain in-court identifications were not subject to the prophylactic rules set forth in *Dickson*. The court stated: "In cases in which there has been no pretrial identification,

however, and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court. . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue. . . . For example, in cases in which the trial court determines that the only issue in dispute is whether the acts that the defendant admittedly performed constituted a crime, the court should permit a first time in-court identification. In cases in which the defendant concedes that identity or the ability of a particular witness to identify the defendant as the perpetrator is not in dispute, the state may satisfy the prescreening requirement by giving written or oral notice to that effect on the record." (Citations omitted.) Id., 445–46. The court clarified that, if a defendant did not dispute a witness' ability to identify him, but merely disputed such witness' testimony on other grounds, the witness would be "properly permitted to make a first time in-court identification of the defendant" without violating due process. Id., 446 n.28.

The defendant seeks review pursuant to the *Golding* doctrine. We previously set forth the parameters of the *Golding* doctrine in part I of this opinion. We will review the claim because the record provides us with an adequate basis to do so, and the claim is of constitutional magnitude. We conclude, however, that the claim fails under *Golding*'s third prong because the defendant is unable to demonstrate that a constitutional violation exists and deprived him of a fair trial.

In arguing that the victim's in-court identification deprived him of his right to due process,[5] the defendant argues: "[T]here was no evidence presented that [the victim] ever identified [the] defendant in a nonsuggestive out-of-court setting of any kind at all. None of the police officers testified that she identified [the] defendant as 'Apollo,' her alleged attacker, in any interview or constitutionally acceptable [photographic] array or lineup. There is not a shred of evidence [that the victim] ever identified [the] defendant at all outside of court. Moreover, her in-court identification was tainted with [the trial court's] leading question, so it cannot be trusted. . . .

"Since no prior, out-of-court nonsuggestive identifications were made, the state was obligated to seek the court's permission to have nonsuggestive . . . identifications made and have a hearing on how that could be accomplished. . . . Short of that, the in-court identifications are not to be allowed." (Citations omitted.)

The defendant does not challenge the victim's in-court identification of him as the person who resided with her over the course of several weeks in December, 2014, and whom she knew to be "Ricardo Swilling" or "Apollo." The victim testified, and the defendant did

not dispute, that she was familiar with the defendant prior to the time that the person identified in the record as Luis accompanied the defendant to her home because he needed a place to stay. The victim testified that she first met the defendant in 2013, at which time she had a lengthy conversation with him. Far from attempting to demonstrate that the victim was unfamiliar with him prior to the events at issue, the defendant testified that, prior to December, 2014, he and the victim were in a sexual relationship. The defendant's theory of defense, articulated during closing argument, was not that the victim was unable to identify him correctly. Rather, defense counsel suggested that an unnamed third party who was a tenant of the victim had committed the crimes at issue, the victim was too fearful to identify this third party, and, because she was in need of assistance and felt pressure to name a perpetrator following the incident, she falsely named the defendant as her assailant because he happened to be staying with her at that time.

The facts of the present case reflect that there was no factual dispute with respect to whether the victim had the ability to identify the defendant. The victim's familiarity with the defendant was not a disputed issue of fact. The victim's ability to observe, recall, and narrate facts concerning the person that allegedly assaulted her and held her hostage in her apartment during the course of two days also was not a disputed issue of fact. Accordingly, despite the fact that the record is silent with respect to any out-of-court identification made by the victim in the present case, the victim's in-court identification of the defendant as the perpetrator of the crime was permissible absent adherence to the procedural safeguards that the court in *Dickson* made applicable to first time in-court identifications.

The defendant also focuses on the state's failure to request permission to conduct a first time in-court identification as is required by the newly created procedural rules announced in *Dickson*. See *State* v. *Dickson*, supra, 322 Conn. 445–46. As the state correctly observes, the victim's in-court identification occurred on February 29, 2016. The defendant filed the present appeal on June 28, 2016. Our Supreme Court, however, did not officially release its decision in *Dickson* until August 9, 2016. With respect to the applicability of the procedural rules announced in *Dickson*, our Supreme Court stated that they applied "to the parties to the present case and to all pending cases. It is important to point out, however, that, in pending *appeals* involving this issue, the suggestive in-court identification has already occurred. Accordingly, if the reviewing court concludes that the admission of the identification was harmful, the only remedy that can be provided is a remand to the trial court for the purpose of evaluating the reliability and the admissibility of the in-court identification under the totality of the circumstances. . . .

If the trial court concludes that the identification was sufficiently reliable, the trial court may reinstate the conviction, and no new trial would be required." (Citations omitted; emphasis in original; footnote omitted.) Id., 451–52.

In the present case, although we would be obliged to afford the defendant relief if he had demonstrated a violation of his due process rights, he is not necessarily entitled to relief arising from the prosecutor's failure to abide by a procedural rule that was not in existence at the time of trial. For the reasons already discussed, we do not conclude that the admission of the victim's in-court identification violated his constitutional rights. Because there is no showing of harm, there is no need to upset the judgment of the trial court or to remand the case to the trial court for further proceedings with respect to the identification.

With respect to the victim's in-court identification of him as the perpetrator, the defendant is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.[6] Accordingly, the claim fails under *Golding*'s third prong.[7]

### III

Next, the defendant claims that the court improperly admitted evidence of his prior felony convictions. We disagree.

The following additional facts are relevant to the present claim. After the state rested its case-in-chief, defense counsel indicated to the court that the defendant intended to testify. After the court addressed the defendant about his decision to testify, the court asked the prosecutor to identify prior convictions of the defendant that the state intended to use for impeachment purposes. The prosecutor replied that he intended to ask the defendant if he had been convicted of four felony crimes on July 13, 2001. The prosecutor stated that, on that date, the defendant was convicted of burglary in the first degree, carrying or selling a dangerous weapon, kidnapping in the first degree with the use of a firearm, and kidnapping in the second degree with the use of a firearm. The prosecutor indicated that he did not intend to elicit the names of these felony crimes. The prosecutor represented that the convictions occurred in 2001, but the defendant was not discharged to special parole until May 22, 2013. In terms of the remoteness of the convictions, the state argued that the fact that the defendant was not discharged to special parole until May 22, 2013, put the convictions "well within" a ten year window of the trial. Defense counsel objected[8] on the ground that the convictions were too remote in time and that reference to the convictions would be unduly prejudicial to the defense.

In relevant part, the court ruled: "I will allow the state to impeach him. . . . I'm not clear what the nature of

the burglary is because there is no indication whether there is larcenous intent in regard to that statute. But, it's clear [that] those offenses, the burglary first degree and carrying a dangerous weapon, kidnapping second, kidnapping first are all felonies and under the case law, the felonies do go to the truth and veracity, and not as much as crimes such as larceny or perjury. But they still are considered admissible, and do go to truth and veracity. I'm required at this point to weigh three factors. The extent of any prejudice likely to arise, the significance of the commission of the particular crime indicating on truthfulness and remoteness in time.

"I'll find that while these offenses—the convictions are [in] July of 2001, he was not discharged. He wasn't released from prison until May 22, 2013. . . . I'll indicate [that] I'm reading from a business record from the Department of Correction indicating [that] he was discharged from prison . . . to parole, on May 22, 2013, and that as of the date of this incident, December 26, 2014, he was still on parole. He may even still be on parole today, but regardless, he certainly was on parole up until December 26th. . . .

"So, as a result, I believe that the case law indicates that this conviction, while starting on July 13, 2001, is still, in effect, even today as we speak, but certainly when he was discharged just approximately three years ago. So, I find for that purpose, it's not too remote in time.

"I also find that since it's going to be referred to as unnamed felonies . . . and also since the state is going to refer to the date of conviction, which is 2001, that the extent of the prejudice is minimal.

"And as far as the significance of the commission of the particular crimes here regarding truthfulness, it would appear that they aren't the type of crimes ordinarily associated with truthfulness, but the case law indicates that because they are felonies, they . . . as opposed to misdemeanors . . . [reflect on the defendant's] truthfulness . . . . Obviously, less than a larceny would, but still some elements.

"So, based on all the weighing of those factors, and the fact that [the] state is prohibited from referring to the particular offenses and is also prohibited from mentioning when he got off of parole, or [was] released from prison . . . the argument could be made by the defense that he doesn't have a conviction since 2001. So, I don't think there is the prejudice that might be associated with, you know, some reference to something more recent.

"So, I am going to allow the state to impeach with those four offenses. I will also indicate that the defendant was apparently convicted of [a] burglary charge and was in . . . 1997, which, under . . . my reading of the statute could possibly be used as a source of

impeachment since he has one or more offenses within the ten years. But in discussing with the state, I urge the state not to impeach him with that, so from a balancing standpoint, I . . . ask the state not to do that. They are not going to do that. So, that was something that went into my decision to allow impeachment as I've described."

During the state's cross-examination of the defendant, the prosecutor asked the defendant if he was a convicted felon in that he had been convicted of four felony crimes on July 13, 2001. The defendant acknowledged that he had been convicted of these felony crimes. Immediately after the prosecutor elicited this evidence, the court provided a limiting instruction to the jury in which it ordered the jury to consider the evidence only with respect to an assessment of the defendant's credibility.[9]

During the state's closing argument, the prosecutor did not expressly rely on the defendant's prior felony convictions. During defense counsel's closing argument, counsel referred briefly to the impeachment evidence at issue by reminding the jury that the testimony with respect to the defendant's four felony convictions was admitted solely for use in the jury's assessment of his credibility generally.[10] During its charge to the jury, the court reiterated, in substance, the limiting instruction that it provided to the jury immediately after the state elicited testimony from the defendant concerning the four unnamed felony convictions.[11]

Presently, the defendant argues that, by permitting the state to introduce evidence that, in 2001, he was convicted of committing four felony crimes, the court "violated [his] right to due process of law and a fair and impartial trial," and, in the alternative, the court abused its discretion, thereby undermining his defense. Although, in his initial discussion of the present claim in his brief, the defendant makes reference to an alleged violation of his constitutional rights, his analysis of the claim focuses solely on the issue of whether the court abused its discretion in admitting the evidence and whether its improper ruling was harmful to the defense. Thus, the defendant abandoned any claim of constitutional magnitude with respect to the court's ruling.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush. . . . Thus, because the sine qua non of preservation is fair notice to the trial court . . . the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753–54, 66 A.3d 869 (2013).

As we discussed previously in this opinion, at the time that defense counsel objected to the admission of evidence related to the prior convictions, he argued that they were too remote in time and that they were more prejudicial than probative. To the extent that the defendant attempts to undermine the court's ruling by arguing for the first time before this court that the evidence simply was not at all relevant in an assessment of his veracity, we decline to address that aspect of his claim. We will review the grounds advanced before the trial court related to the prejudicial nature of the evidence as well as its remoteness.

"It is well settled that evidence that a criminal defendant has been convicted of crimes on a prior occasion is not generally admissible. . . . There are, however, several well recognized exceptions to this rule, one of which is that [a] criminal defendant who has previously been convicted of a crime carrying a term of imprisonment of more than one year may be impeached by the state if his credibility is in issue. . . . In its discretion a trial court may properly admit evidence of prior convictions provided that the prejudicial effect of such evidence does not far outweigh its probative value. . . . [Our Supreme Court] has identified three factors which determine whether a prior conviction may be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time. . . . A trial court's decision denying a motion to exclude a witness' prior record, offered to attack his credibility, will be upset only if the court abused its discretion. . . . Those three factors have been incorporated in [the Connecticut] [C]ode of [E]vidence. Conn. Code Evid. § 6-7 (a). . . .

"There is no doubt that if evidence of a felony conviction is otherwise admissible, the name of the crime is generally also admissible. See Conn. Code Evid. § 6-7 (c) ([i]f, for purposes of impeaching the credibility of a witness, evidence is introduced that the witness has been convicted of a crime, the court shall limit the

evidence *to the name of the crime* . . . except that
. . . the court *may* exclude evidence of the name of
the crime . . . ." (Citations omitted; emphasis in origi-
nal; internal quotation marks omitted.) *State* v. *Young*,
174 Conn. App. 760, 768–69, 166 A.3d 704, cert. denied,
327 Conn. 976, 174 A.3d 195 (2017). "As indicated in
§ 6-7, the court has discretion to admit the prior convic-
tion as an unnamed felony. Factors to consider include
whether the prior crime reflects directly on credibility
and whether the prejudice inherent in the name of the
crime outweighs the probative impeaching value. . . .

"[I]n evaluating the separate ingredients to be
weighed in the balancing process, there is no way to
quantify them in mathematical terms. . . . Therefore,
[t]he trial court has wide discretion in this balancing
determination and every reasonable presumption
should be given in favor of the correctness of the court's
ruling . . . . Reversal is required only where an abuse
of discretion is manifest or where injustice appears to
have been done. . . . The burden lies with the party
objecting to the admission of evidence of prior convic-
tions to demonstrate the prejudice that is likely to arise
from its admission. . . . The test for determining
whether evidence is unduly prejudicial is not whether
it is damaging to the defendant but whether it will
improperly arouse the emotions of the jury." (Citations
omitted; internal quotation marks omitted.) Id., 769–70.

"[P]rior convictions that are admissible for impeach-
ment purposes may be segregated into two general cate-
gories. First are those crimes that by their very nature
indicate dishonesty or tendency to make false state-
ment. . . . Beyond the obvious violations such as per-
jury or false statement, we have recognized that crimes
involving larcenous intent imply a general disposition
toward dishonesty such that they also fall within this
category. . . . Convictions of this sort obviously bear
heavily on the credibility of one who has been convicted
of them. The probative value of such convictions, there-
fore, may often outweigh any prejudice engendered by
their admission.

"The second category involves convictions for crimes
that do not reflect directly on the credibility of one who
has been convicted of them. . . . The theory behind
the admissibility of these convictions as evidence of
credibility posits that conviction of a crime demon-
strates a bad general character, a general readiness to
do evil and that such a disposition alone supports an
inference of a readiness to lie in the particular case
. . . .

"Convictions of crimes that fall within this second
category blemish the character of one so convicted. A
juror might reasonably conclude that such a witness
lacks to some degree the moral rectitude from which
a witness's oath of honesty derives its credibility. Never-
theless, conviction of a crime not directly reflecting on

credibility clearly lacks the direct probative value of a criminal conviction indicating dishonesty or a tendency to make false statement. Thus, the balance used to measure admissibility of prior convictions is weighted less heavily toward admitting the prior conviction when it involves a crime related only indirectly to credibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Geyer*, 194 Conn. 1, 12–13, 480 A.2d 489 (1984). "To avoid unwarranted prejudice to the witness, when a party seeks to introduce evidence of a felony that does not directly bear on veracity, a trial court ordinarily should permit reference only to an unspecified crime carrying a penalty of greater than one year that occurred at a certain time and place." *State* v. *Pinnock*, 220 Conn. 765, 780, 601 A.2d 521 (1992). "That prudent course [of permitting evidence of unnamed felony convictions] allows the jury to draw an inference of dishonesty from the prior conviction without the extraordinary prejudice that may arise from naming the specific offense. . . . Ultimately, [t]he trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions." (Citation omitted; internal quotation marks omitted.) *State* v. *Muhammad*, 91 Conn. App. 392, 401, 881 A.2d 468, cert. denied, 276 Conn. 922, 888 A.2d 90 (2005).

We first address the defendant's claim that the court abused its discretion in admitting evidence of the convictions because they were too remote. It appears to be undisputed that the convictions occurred in 2001, but that the defendant's release from confinement in connection with those convictions did not occur until May 22, 2013. The defendant argues that the convictions occurred nearly fifteen years prior to the time of trial, which occurred in 2016. Ignoring the significance of the date of his release from confinement, the defendant asserts that he was serving the special parole portion of his sentence at the time of trial and, thus, the ten year presumptive bar to the prior convictions evidence should have applied. The defendant correctly acknowledges in his brief that there is no legal precedent in support of his argument.[12]

This court has explained: "[T]he fact that a prior conviction is more than ten years old should greatly increase the weight carried by the third prong in the balancing test set forth in § 6-7 of the Connecticut Code of Evidence, unless that prior conviction relates to the witness' veracity. . . . That ten year benchmark, however, does not present an absolute bar to the use of a conviction that is more than ten years old but rather functions as a guide to assist the court in evaluating the conviction's remoteness. . . . [T]he measuring point for a remoteness determination under § 6-7 of the Connecticut Code of Evidence is the date of conviction or the date of release from resulting confinement,

whichever is later." (Citations omitted; internal quotation marks omitted.) Id., 399–400. Because the defendant was released from confinement within ten years of the time of trial, the defendant's argument that the convictions were too remote is not persuasive.

With respect to the defendant's argument that the evidence was unduly prejudicial, he argues that because he was facing serious felony charges in the present case, the admission of the evidence at issue "was likely to lead the jury to conclude [that he] was more likely guilty in this case." Observing that the jury's assessment of his credibility was a critical factual issue in the present case, the defendant asserts that the evidence was "unduly prejudicial and of minor probative value."

The court carefully applied the correct legal principles in its assessment of the evidence. The court properly recognized that the four felony convictions, which arose from charges of burglary in the first degree, carrying or selling a dangerous weapon, kidnapping in the first degree with the use of a firearm, and kidnapping in the second degree with the use of a firearm, did not reflect *directly* on the defendant's credibility. The court recognized, however, that the felony convictions nonetheless were relevant in an assessment of the defendant's credibility. In light of the legal principles previously discussed in this opinion, the defendant is unable to demonstrate that the court's determination that the felony convictions were relevant in an assessment of his credibility was not proper, nor did he attempt to do so at the time of trial.

The defendant, noting that the evidence was adverse to him, argues that the evidence was prejudicial. All adverse evidence is prejudicial. Here, the court took several measures to ensure that the evidence was not *unduly* prejudicial. First and foremost, the court limited the state's inquiry to unnamed felonies that occurred in 2001. The jury learned no details related to the crimes which arguably might have inflamed negative feelings toward the defendant. Additionally, the court provided the jury with a limiting instruction immediately following its admission of the evidence at issue, and it reiterated this instruction during its charge. The defendant does not argue that the court's instructions were deficient and provides us with no reason to doubt that the jury followed these instructions in its careful assessment of the evidence.

For the foregoing reasons, the defendant has failed to demonstrate that the court abused its discretion in admitting the prior conviction evidence.

IV

Next, the defendant argues that the court improperly admitted a recording of a 911 call made by the victim. We disagree.

The following additional facts are relevant to the

present claim. During the victim's direct examination by the state, she testified about the ordeal that she endured in her apartment over the course of two days and how, immediately after she fled her apartment on December 25, 2014, she ran to Matos' apartment and sought assistance from him. The victim testified that, once she was inside Matos' apartment, she hid in a closet. She asked Matos to call 911 for her and, after the call was made, she spoke to a dispatcher at the 911 call center. At that juncture in the victim's examination, the prosecutor asked her if she recognized a CD that the state marked as an exhibit for identification purposes. The victim testified that she recognized the CD and had listened to portions of it at the courthouse. She testified that it contained a recording of the conversation that she had with the 911 dispatcher on December 25, 2014.

When the prosecutor offered the recording as a full exhibit, defense counsel objected to its admission on the ground of hearsay. After the court excused the jury, the prosecutor argued that the recorded statements were not hearsay because they were the victim's spontaneous utterances immediately following her escape from captivity that were made while she was still experiencing the stress and excitement of the violent event. The prosecutor argued, as well, that the recorded statements were not hearsay because they were statements made by the victim related to her then-existing medical condition.

Initially, the court expressed concerns with respect to the authenticity of the exhibit offered by the state, but defense counsel stated that he was not raising an objection based on authentication. Rather, defense counsel stated, that his objection was based on the fact that the recording was hearsay and it was cumulative evidence because "this witness can clearly testify [with respect to] all of the things that would be revealed on the tape. What was your state of mind at the time? She can tell us. . . . What did you tell the police? She can tell us that. . . . So, under the circumstances, I don't see any need to admit the tape."

Noting that defense counsel was not objecting on authentication grounds, the court asked the prosecutor to play the recording. In the recording, the victim made many statements, some of which were unprompted and some of which were responsive to questions posed to her by a 911 dispatcher. She identified herself and provided her location. She indicated that she had been kidnapped in her apartment by a five foot, eight inch tall black male with "long dreads" named "Rick," who had the street name of "Apollo." The victim stated that she knew her assailant, and that, while she was alone with him, he stabbed her with kitchen knives and choked, beat, and tortured her. The victim stated that she had escaped to her current location, a neighbor's

apartment, but that she was "bleeding all over" and needed an ambulance. The victim stated her belief that the perpetrator was still asleep in her apartment.

After the court heard the recording, defense counsel reiterated his view that the recording was inadmissible because it was hearsay and it was cumulative. Additionally, defense counsel argued that the recording was more prejudicial than probative. The prosecutor replied that the evidence, which shed light on the victim's state of mind in the minutes after she fled from her apartment, was relevant to the jury's assessment of the victim's credibility. Additionally, the prosecutor reiterated his belief that the statements were not inadmissible hearsay because they were the excited utterances of the victim.

The court ruled: "It's not admissible for credibility. She hasn't been cross-examined. . . . [I]t may become admissible under some of the case law that discusses that, but at this point that is not why it's admissible.

"I've listened to the entire 911 call, which is in four or five separate sections. It is clear, even though a number of the . . . statements [made by the victim] are made in response to questions [posed to her by the 911 dispatcher] which would militate against a spontaneous utterance exception, it is clear in listening to her voice, her voice is many times hurried. She seems out of breath during most of the conversation. It is clear that she's under the influence of a startling event. It's within minutes, if not seconds, of her being released from, or escaping, I should say, from the house that she was being held captive in. It's her . . . rambling, again, reflecting a lack of forethought in responding to things. It's just a spur of the moment. So, it's clear that most of the statements made by her are admissible for the truth of the matter as spontaneous utterance.

"To the extent that there are some things in there that are not . . . it's just a repeat of some previous things that were said. Additionally, there are some descriptions of the defendant. Those are admissible under the identification exception to the hearsay rule. And . . . under § 8-5 [of the Connecticut Code of Evidence], she's available for cross-examination. So that's available there.

"This is a 911 call and, therefore, would come in as a business record exception if the state would lay a foundation for that which they up to now have not done. But, additionally, I find that under the residual exception, it indicates a statement that is not admissible under any of the foregoing exceptions. I think it is admissible under a number of the foregoing exceptions. But, it's certainly admissible if the court determines there is a reasonable necessity for the admission of the statement. This is the only time. There's no other 911 calls, so there is a reasonable necessity for the admission of it in the statement supported by the equivalent

guarantees of trustworthiness and reliability essential to other evidence admitted. I find it extremely trustworthy and reliable given the fact that it's a recorded statement. It was done within seconds, or minutes, of being released from captivity, and, therefore . . . the 911 call in its entirety is admissible in full." Thereafter, the court summoned the jury to the courtroom and the recording was played in the jury's presence.

Presently, the defendant challenges the court's ruling by arguing that the court erred in its determination that the victim's statements were spontaneous utterances and that admitting the recording was not unduly prejudicial to the defense.[13] We will review these preserved evidentiary issues, in turn.[14]

A

First we address the defendant's argument that the court improperly determined that the recording fell within the spontaneous utterance exception to the hearsay rule. Our Supreme Court has set forth the standard of review we are bound to utilize in hearsay claims: "To the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no judgment call by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . .

"We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought. For example, whether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination. Similarly, appellate courts will defer to the trial court's determinations on issues dictated by the exercise of discretion, fact finding, or credibility assessments." (Citations omitted; internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Section 8-3 of the Connecticut Code of Evidence

sets forth exceptions to the hearsay rule that apply regardless of the availability of the declarant. Conn. Code Evid. § 8-3. One such exception is the spontaneous utterance exception set forth in § 8-3 (2), which applies to: A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. Under § 8-3 (2), an out-of-court declaration will not be excluded under the hearsay rule when the following factors are established: (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . .

"In determining whether a declaration is admissible as a spontaneous utterance, the court should look at various factors, including [t]he element of time, the circumstances and manner of the accident, the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not, or made in response to question, or involuntary, and any other material facts in the surrounding circumstances . . . . The relation of the utterance in point of time to the accident or occurrence, while an important element to be considered in determining whether there has been opportunity for reflection, is not decisive. . . . Instead, [t]he overarching consideration is whether the declarant made the statement before he or she had the opportunity to undertake a reasoned reflection of the event described therein." (Citations omitted; internal quotation marks omitted.) *State* v. *Daley*, 161 Conn. App. 861, 883–84, 129 A.3d 190 (2015), cert. denied, 320 Conn. 919, 132 A.3d 1093 (2016).

The defendant challenges the court's determination that the circumstances in which the victim made the recorded statements negated the opportunity for deliberation and fabrication by her. As set forth previously, the court made myriad findings in this regard. After listening to the recording, the court found that the victim sounded "hurried" and "out of breath" during most of her conversation with the 911 dispatcher. At times, the court found, the victim appeared to be "rambling . . . ." The victim testified, and the recording reflects, that the 911 call was made immediately after the victim escaped from her apartment and, desperately seeking assistance, gained access to Matos' apartment. Thus, the court found that the recording was made "within minutes . . . of her . . . escaping . . . from the house that she was being held captive in." Crediting the victim's testimony that she had been tortured during the course of two days and appeared at Matos' apartment only after rushing out of her apartment when the defendant was asleep, while still bloodied from a plethora of stab wounds, the court observed that the

victim clearly was "under the influence of a startling event" at the time the 911 call was made. The court correctly recognized that many of the victim's statements were made in response to questions posed to her by the 911 dispatcher, yet found that that the circumstances reflected a "lack of forethought" by the victim in responding to these questions and "spur of the moment" statements by her.

The defendant argues that the victim's statements were not spontaneous because many of them were made in response to questions posed to her by the 911 dispatcher, the court's assessment of the victim's speech pattern was insignificant to a proper analysis, the court improperly appeared to resolve the "ultimate issue of the case" that she had been held captive, and the evidence reflected that the victim made the statements from the safety of Matos' apartment, at which point in time "she was able to collect her thoughts and respond to questions."

Our careful review of the recording reflects that some of the victim's statements in the recording at issue were made in response to questions posed to her by the 911 dispatcher. Many others, however, were made spontaneously. Nevertheless, the central premise of the defendant's argument is not legally correct. "[T]hat a statement is made in response to a question does not preclude its admission as a spontaneous utterance." *State* v. *Kirby*, 280 Conn. 361, 376, 908 A.2d 506 (2006); *State* v. *Davis*, 109 Conn. App. 187, 195 n.3, 951 A.2d 31 (same), cert. denied, 289 Conn. 929, 958 A.2d 160 (2008); *State* v. *Nelson*, 105 Conn. App. 393, 407, 937 A.2d 1249 (same), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008).

The defendant does not cite any authority in support of his argument that the court's observations with respect to the sound of the victim's voice, or the hurried nature of her speech, were irrelevant to an assessment of whether her statements reflected a lack of forethought on her part. One of the factors relevant to an assessment of whether a declarant spoke spontaneously or not is his mental and physical condition at the time of the declaration at issue. In an analysis of relevant facts, an observation that a declarant had spoken slowly, calmly, and without emotion might support an inference that he had carefully considered his statements. An observation that he had spoken rapidly, emotionally, or while out of breath might support an inference that he had not carefully considered his statements. Accordingly, this court has reasoned that a declarant's "emotional tone of voice," as reflected in a 911 call recording, was one of several factors supporting a finding that the 911 recording was a spontaneous utterance. *State* v. *Silver*, 126 Conn. App. 522, 537, 12 A.3d 1014, cert. denied, 300 Conn. 931, 17 A.3d 68 (2011); see also *State* v. *Kirby*, supra, 280 Conn. 376–77 (that

declarant " 'sounded highly emotional' " was relevant factor in assessment of whether declarant's statements were spontaneous utterances). The court properly considered the manner in which the victim spoke in its review of all of the relevant facts surrounding the victim's statements.

The defendant suggests impropriety in that the court found that the statements at issue were made within minutes after she had escaped from her apartment because this was "the ultimate issue of the case . . . ." The defendant, however, did not dispute that the victim was assaulted over the course of two days in her apartment or that she had escaped captivity, fled to Matos' residence, and called 911 upon her arrival. Instead, the ultimate issue in the case was the identity of the perpetrator of the crimes at issue. Accordingly, the defendant's argument is not supported by the record.

Last, the defendant disagrees with the court's finding that the victim's statements to the 911 dispatcher were spontaneous. He argues that the evidence supported a finding that, by the time that the 911 call was made by the victim, she was in a safe place and was able to collect her thoughts. There was ample evidence to the contrary. As the court observed, the 911 call occurred within minutes of the victim fleeing her apartment following a lengthy and violent ordeal that reasonably would be expected to have created a high degree of emotional disturbance in the victim. At the time that the statements were made, the victim was hiding from the perpetrator in her neighbor's apartment. There was evidence that, at the time that the victim spoke with the 911 dispatcher, her mental condition was fearful because she informed the dispatcher that she did not want to go outside because "[h]e might come and find me again." In terms of her physical condition, the victim stated that she was in need of an ambulance and that she was "bleeding all over." In light of all the relevant circumstances surrounding the statement, the defendant is unable to demonstrate that the court abused its discretion in finding that the declarations were made under circumstances that negated the opportunity for deliberation, contrivance, and misrepresentation by the declarant.

### B

The defendant argues that the admission of the 911 recording was unduly prejudicial to the defense because it tended to arouse the jury's emotions, hostility or sympathy.[15] We disagree.

"Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. We note that "[a]ll adverse

evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *William C.*, 103 Conn. App. 508, 519–20, 930 A.2d 753, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007).

With respect to the issue of improperly arousing the emotions of the jury, the defendant argues that the 911 recording had a general tendency to invoke sympathy for the victim and that it was inflammatory because in it the victim referred to the fact that she had been "kidnapped for two days" and that the defendant had been "torturing" her. Additionally, the defendant argues that the 911 recording was prejudicially cumulative: "Given the cumulative effect of the 911 call with [the victim's] in-court testimony, the 911 call served simply to arouse the juror's sympathy for [the victim] without providing any additional substantive information that she had not already given in her direct testimony."

The defendant's broad assessment of the 911 recording as prejudicially cumulative evidence is not supported by the record. Before the trial court, the defendant argued that the evidence was cumulative because the victim could testify about the details set forth in the 911 recording. He did not distinctly argue that the 911 recording was prejudicial because it was cumulative, so a claim based on that ground in not properly before us.[16] In any event, we observe that the 911 recording was introduced during the victim's direct examination. The victim was the first witness called by the state in its case-in-chief. Although she related, in detail, many specific facts concerning the episode in her apartment, the victim did not relate all of the specific information that she had provided to the dispatcher during the 911 call. This information included a detailed description of the perpetrator as well as the entire substance of the details that the victim provided to the dispatcher. To the contrary, the victim merely had testified that she made a 911 call from Matos' residence. Accordingly, we reject the contention that the 911 recording was prejudicial because it was cumulative.

Although the defendant argues that the recording was inflammatory we disagree that it was any more inflammatory than the victim's lengthy testimony concerning the defendant's actions by which he prevented her from leaving her apartment over the course of two days and repeatedly assaulted her in a variety of ways. This included beating, choking, kicking, and repeated

stabbings. During the recording, the victim referred to the fact that the defendant had "tortured" her and "kidnapped" her. We are not persuaded that this strong language was likely to have aroused the jury's emotions any more than the factual recitation that she set forth in her testimony. Accordingly, we conclude that the court did not abuse its discretion by failing to conclude that the evidence was unduly prejudicial.

V

Finally, the defendant claims that the cumulative effect of the court's errors deprived him of his right to a fair and impartial trial. This claim lacks merit.

In his brief, the defendant argues: "In the alternative to the claims [raised previously in this opinion], assuming this court finds that, alone, none of those claims is sufficient to state a claim for relief in the form of a remand and new trial, then the cumulative effect of the violations of [the] defendant's rights and evidentiary decisions discussed [in those claims is] together sufficient to undermine confidence in the result of [the] defendant's trial." Beyond this conclusory statement, the defendant merely cites to three federal cases in support of this claim.

We observe that this claim is not adequately briefed in that it consists of a legal assertion and is devoid of any analysis of facts or law.[17] Even if we were to consider this claim of cumulative error[18] on its merits, we would conclude that it lacks merit because we have not concluded that any error exists with respect to the claims previously addressed in this opinion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant was charged with assault in the first degree in violation of General Statutes § 53a-59 (a) (1). The jury returned a verdict of not guilty with respect to that count, but found the defendant guilty of the lesser included offense of assault in the second degree in violation of § 53a-60 (a) (2).

[2] The court sentenced the defendant to a total effective term of incarceration of forty years, which includes a twenty year mandatory minimum sentence, followed by ten years of special parole.

[3] Although the defendant refers to his rights under the state and federal constitutions, he has not provided this court with an independent analysis of his claim under the state constitution in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Accordingly, we deem his state constitutional claim abandoned. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 748 n.1, 155 A.3d 188 (2017).

[4] Alternatively, the defendant argues that reversal is warranted under the plain error doctrine, codified in Practice Book § 60-5, which "is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party." (Internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–96, 134 A.3d 560 (2016). In light of our conclusion that the present claim fails on its merits under the bypass rule of *Golding* and that the court acted well within its discretion by questioning the witnesses as it did to clarify the testimony of both witnesses, the defendant cannot demonstrate that plain error exists. Additionally, the defendant urges us to exercise our supervisory authority to grant him relief. In light of our assessment of the court's limited

and proper intervention in the presentation of evidence, we reject the defendant's invocation of this rarely utilized doctrine. As our Supreme Court has explained: "The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 576, 4 A.3d 1176 (2010).

[5] To the extent that the defendant has attempted to raise a claim under our state constitution, he has abandoned such claim by virtue of his failure to provide this court with an independent analysis of it. See footnote 3 of this opinion.

[6] In the context of challenging the victim's in-court identification under *Dickson*, the defendant purports to raise "an additional ground of error" under *Dickson* with respect to Matos. Specifically, the defendant argues that, despite the fact that there was no evidence that Matos had identified the defendant previously, the court nonetheless "prompted" Matos to make an in-court identification of the defendant. We have concluded in part I of this opinion that the court's inquiries of Matos were proper. Despite the fact that the defendant challenges the court's inquiries of Matos, he nonetheless acknowledges that Matos never made an in-court identification of the defendant. Setting aside our concern that the defendant's scant analysis of this aspect of his unpreserved claim does not constitute adequate briefing, we readily conclude that it fails under *Golding*'s third prong in light of the undisputed fact that an in-court identification by Matos did not occur in the present case.

[7] To the extent that the defendant argues, in the alternative, that plain error exists with respect to either aspect of the present claim under *Dickson*, we conclude, in light of the reasons discussed in our *Golding* analysis, that the defendant has failed to demonstrate that plain error exists. Additionally, to the extent that the defendant requests extraordinary relief in terms of the exercise of our supervisory authority, we conclude that our review of the present claim does not reflect the existence of any infringement of the defendant's rights and does not give rise to any concerns that would warrant the exercise of our supervisory authority.

[8] The record reflects that, prior to this point in the trial, defense counsel filed a motion in limine to preclude the state from introducing evidence pertaining to the defendant's criminal record. Therein, the defendant argued that such evidence was "not probative as to any material issue in the present case and is so highly prejudicial as to inflame the jury."

[9] The court stated: "[T]his evidence that you've just heard is the defendant was convicted in 2001 of felony charges. A felony is a crime for which a person can be incarcerated for more than one year. The evidence of the commission of a crime other than the one charge[d] is not admissible to prove the guilt of the defendant in this particular case. The commission of the other matters . . . by this defendant, has been admitted into evidence for the sole purpose of affecting his credibility. You must weigh the testimony and consider it along with all the other evidence in this case. You may consider the convictions of the defendant only as they bear upon his credibility. And you should determine that credibility based on the same considerations you would give any other witness."

[10] Defense counsel argued in relevant part: "[The defendant] admitted that back in 2001, he was convicted of four felonies on the same date and time, so they obviously were all a result of one incident, presumably. And I bring your attention to that simply to alert you that the judge will tell you that that information is admissible only on the question of [the defendant's] credibility. That is, you can't use that information to say, well, if he's been convicted of a felony, some, now, fifteen years ago, therefore he's guilty of this felony. You can't use that information in any way to draw that type of conclusion. The only reason it's admissible, and it was allowed here in court today, is for your consideration as to whether or not it may affect his overall credibility. That's something for you to consider. But certainly you are not to consider it with regards to whether or not he's guilty of the crimes charged here."

[11] The court stated in relevant part: "In this case, evidence was introduced to show that in 2001, the defendant was convicted of felony charges. A felony is any crime for which a person may be incarcerated for more than one year. Evidence of the commission of a crime, other than the one charged, is not admissible to prove the guilt of the defendant in this particular case.

The commission of other matters by this defendant has been admitted into evidence for the sole purpose [of] affecting his credibility. You must weigh the testimony and consider it along with all the other evidence in the case. You may consider the convictions of the defendant only as they bear upon his credibility and you should determine that credibility upon the same considerations as those given to any other witness.''

[12] At the time of oral argument before this court, the defendant's appellate counsel acknowledged that the defendant was released from confinement in 2013 and that the date he was released from confinement was not insignificant in evaluating whether the convictions were admissible.

[13] In his appellate brief, the defendant also argues that the court abused its discretion in admitting the evidence because it was not authenticated. Because, at the time of trial, the defendant expressly waived any objection on the ground of authentication, we decline to review this aspect of his claim. "We generally do not review unpreserved, waived claims. . . . To reach a contrary conclusion would result in an ambush of the trial court by permitting the defendant to raise a claim on appeal that his or her counsel expressly had abandoned in the trial court." (Citation omitted; internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009).

To the extent that the defendant argues that the court erroneously relied on the residual exception to the hearsay rule, we need not address this aspect of his claim. Our conclusion that the court properly relied on the spontaneous utterance exception is a sufficient basis on which to uphold the court's ruling that the statements at issue should not be excluded under the hearsay rule.

[14] To the extent that the defendant claims that plain error exists with respect to this claim, we conclude, on the basis of our determination that the court's evidentiary ruling was a proper exercise of its discretion, that plain error does not exist. Also, to the extent that the defendant claims that the present claim warrants the exercise of our supervisory authority, we conclude in light of our analysis of the court's evidentiary ruling that such a showing has not been made.

[15] Additionally, the defendant argues that he had no reasonable ground to anticipate the evidence, was unfairly surprised, and was unprepared to meet it. The defendant does not explain why he had no reasonable ground to anticipate the evidence, was unfairly surprised, or was unprepared to meet it. Nor does he direct us to where in the record arguments of this nature were raised before and addressed by the trial court.

[16] Additionally, to the extent that the defendant argues before this court that the evidence should have been excluded because its only purpose was to bolster the victim's credibility, we observe that such argument was not advanced before the trial court and, in fact, the court stated in its ruling that it was not admitting the evidence for the purpose of bolstering the victim's credibility.

[17] "[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *State* v. *Claudio C.*, 125 Conn. App. 588, 600, 11 A.3d 1086 (2010), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011).

[18] The state argues that the federal cumulative error rule on which the defendant relies is not legally cognizable in this state. Although we need not reach the merits of this issue, we note that our Supreme Court recently deemed it unnecessary to address a claim in which it was asked to adopt the federal cumulative error rule. *State* v. *Campbell*,     Conn.    ,    ,     A.3d     (2018).