******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## VICTOR ALICEA *v.* COMMISSIONER
## OF CORRECTION
### (AC 47929)

Cradle, C. J., and Alvord and Suarez, Js.

*Syllabus*

The respondent, the Commissioner of Correction, appealed, on the granting of certification, from the habeas court's judgment granting in part the petitioner's petition for a writ of habeas corpus. The respondent claimed that the court improperly determined that the petitioner's criminal trial counsel had rendered ineffective assistance in advising the petitioner not to testify in support of his claim of self-defense in light of the potential admissibility into evidence of certain of the petitioner's prior convictions. *Held*:

The habeas court improperly granted in part the habeas petition, as the petitioner failed to demonstrate that his counsel rendered deficient performance in advising him not to testify, that advice having been within the range of reasonable professional assistance based on counsel's concern that the petitioner's testimony might potentially open the door to the admission of his prior convictions or that the trial court could permit their use as impeachment evidence.

The habeas court improperly determined that the petitioner was prejudiced as a result of his counsel's advice, as the petitioner failed to show, in light of the strength of the state's case, that a reasonable probability existed that the trial's outcome would have been different had his counsel advised him that the admissibility of the prior convictions would have been limited had the petitioner testified, and the petitioner's testimony would have been, to some extent, cumulative of the record already established at the trial.

Argued April 22—officially released September 30, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the petition was withdrawn in part; thereafter, the case was tried to the court, *Bhatt, J.*; judgment granting the petition in part, from which the respondent, on the granting of certification, appealed to this court. *Reversed in part*; *judgment directed*.

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, *Erin Stack*, assistant state's attorney, and *Jennifer M. Fields*, deputy assistant state's attorney, for the appellant (respondent).

*Naomi T. Fetterman*, assigned counsel, with whom, on the brief, was *James E. Mortimer*, assigned counsel, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the petition for a writ of habeas corpus filed by the petitioner, Victor Alicea. On appeal, the respondent claims that the court incorrectly determined that the petitioner's criminal trial counsel had rendered ineffective assistance with respect to purported misadvice regarding the admissibility into evidence of the petitioner's prior convictions were he to testify in support of his claim of self-defense. We agree and, accordingly, reverse in part the judgment of the habeas court.

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found the following facts, as set forth by this court in the petitioner's direct appeal from his conviction. See *State* v. *Alicea*, 191 Conn. App. 421, 215 A.3d 184 (2019), aff'd, 339 Conn. 385, 260 A.3d 1176 (2021). "The [petitioner] and the victim, Tyrone Holmes, worked at Burger King in the Dayville section of Killingly (restaurant). Holmes generally worked third shift as a porter, doing maintenance and cleaning at the restaurant. On July 9, 2015, the [petitioner], who also worked as a porter at the restaurant, was covering Holmes' third shift. After midnight, Holmes, accompanied by his friend, Robert Falu, arrived at the closed restaurant to drop off some supplies and to speak with the [petitioner], whom, he had

heard, had been talking about him. Falu waited in or around Holmes' vehicle while Holmes let himself into the back entrance using his key. Holmes then asked the [petitioner] to step outside. The [petitioner] and Holmes went outside, had a brief discussion, and the [petitioner] denied having talked negatively about Holmes. Everything appeared fine to Holmes. Holmes returned to his vehicle, retrieved some supplies, and went back into the restaurant.

"Upon returning to the restaurant, Holmes heard the [petitioner] on his cell phone telling whoever was listening to get to the restaurant because the [petitioner] had a problem. Holmes told the [petitioner] that they did not have a problem, and the [petitioner] walked away while Holmes was trying to talk to him. Holmes followed the [petitioner], who went near the fryers, and the [petitioner] repeatedly told Holmes that he was trying to save Holmes' life. Holmes, who was holding a set of car keys in his hands, tossing them from one hand to the other, became angry and the two began arguing. The [petitioner] then pulled Holmes' head toward him and cut his throat with a razor blade. Initially, Holmes thought the [petitioner] had punched him, and he assumed a fighter's stance. He then saw that he was bleeding, however, and he ran from the restaurant. Some of the altercation was caught on the restaurant's video. Once outside, Holmes threw his car keys to Falu and told him to start the car. The [petitioner], who had followed Holmes outside, chased him around the car twice, and said, 'see what happens when you mess with me.' Holmes got into the driver's seat of the car and drove away with Falu. After Holmes arrived home, Holmes' wife called 911, and she tried to stop the bleeding from Holmes' neck by applying pressure with a towel. The [petitioner] also called 911 from the restaurant.

"Holmes was taken by ambulance to Day Kimball Hospital in Putnam, where he was examined by Joel Bogner, an emergency medicine physician, who determined that Holmes had sustained a neck laceration that was approximately seven inches long and that the care he needed was 'beyond the capabilities of Day Kimball Hospital . . . .' Holmes was given morphine sulfate for pain and then was transferred to Hartford Hospital, via ambulance, where he underwent surgery for the laceration to his neck, which included the repair of a lacerated neck muscle and his left external jugular vein." Id., 424–26.

The petitioner was arrested and charged with assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and assault in the first degree in violation of § 53a-59 (a) (3). Id., 426. During his criminal trial, the petitioner was represented by Attorney Matthew S. Davis. "The jury found the [petitioner] guilty of both charges, and, after accepting the verdict, the court [*Seeley, J.*] rendered judgment of conviction on both counts. The [petitioner] also pleaded nolo contendere to being a persistent dangerous felony offender. The court merged the conviction of the two assault charges and sentenced the [petitioner] to a mandatory minimum term of ten years of incarceration, followed by twelve years of special parole on the count of intentional assault as a persistent dangerous felony offender." (Footnote omitted.) Id.

After his conviction was affirmed on direct appeal,[1] the petitioner filed a petition for a writ of habeas corpus.

---

[1] The petitioner appealed from the judgment of conviction, claiming that "(1) the jury's verdicts of guilty on both intentional and reckless assault were legally inconsistent, (2) the court erred in excluding his statement to the police, given approximately forty-five minutes after the incident at issue, and (3) the state failed to disprove his claim of self-defense." *State* v. *Alicea,* supra, 191 Conn. App. 424. This court affirmed the judgment of conviction. See id., 450. The petitioner thereafter petitioned for certification to appeal to our Supreme Court, and that court granted certification on the issue of whether this court correctly concluded that the jury's verdicts were not

Relevant to the present appeal, the operative petition alleges that Davis rendered ineffective assistance, inter alia, by "fail[ing] to adequately discuss the legal elements of self-defense, in light of the evidence presented during the petitioner's criminal trial, with the petitioner prior to the petitioner electing to not testify  . . . ."[2] See footnote 7 of this opinion. The respondent filed a return, leaving the petitioner to his proof.

The habeas court, *Bhatt, J.,* conducted a trial on July 9, 2024. The petitioner presented his own testimony, as well as that of Davis and Eric Malarkey, the restaurant manager.

Malarkey testified that there had been some issues with the victim's employment, including showing up late, but that he had been given a second chance and had returned to work without issue a few weeks before the incident. Malarkey told the petitioner that the victim had complained about the quality of the petitioner's work and having to pick up the petitioner's slack. Malarkey testified that it was against restaurant policy for employees who were not working to enter the restaurant after hours and that a provision of the employee handbook stating that policy typically would be reviewed with each new hire. Malarkey also testified that he was not aware of any issues regarding employees entering the back door during off hours.

Davis testified at the habeas trial that the defense theory was that the petitioner had acted in self-defense when he was confronted by the victim. Davis testified

legally inconsistent. See *State* v. *Alicea,* 339 Conn. 385, 390, 260 A.3d 1176 (2021). Our Supreme Court affirmed the judgment of this court. See id., 402.

[2] The petitioner also had alleged that Davis rendered ineffective assistance in failing to present the testimony of Eric Malarkey, the restaurant manager, and failing to object to certain comments made by the prosecutor during closing argument. The habeas court denied both of these claims. The petitioner also had alleged other claims in his petition, which were withdrawn prior to trial.

that he had several discussions with the petitioner regarding the nature of a self-defense claim and the risks and exposure of proceeding to trial. Davis testified that he sought to prove hostility between the victim and the petitioner as contributing to the petitioner's mindset and necessity to defend himself. Davis testified that he discussed with the petitioner the elements of a self-defense claim and that "we absolutely went over what the claim was, how we felt we could prove it." Davis further testified that he sought to establish the petitioner's subjective perception of imminent bodily harm by presenting evidence that the victim had come into the restaurant after hours. Davis testified that he did not perceive difficulty in establishing the subjective perception of imminent bodily harm without the petitioner's testimony because he could use the testimony of other witnesses, including the petitioner's wife. With respect to challenging the victim's testimony that the petitioner had chased him outside with the razor, Davis testified that he believed that it was not an issue because the restaurant's video, which had been entered into evidence, contravened the testimony of the victim on that point. Davis testified that, "I guess, did we consider presenting additional evidence  .  .  .  I would have to say yes. We went with strategically what was the best claim we could make without subjecting [the petitioner] to repeated and abundan[t] cross-examination."

Davis testified that he had a discussion with the petitioner prior to trial regarding whether the petitioner should testify regarding the claim of self-defense and that, after the discussion, the petitioner was in agreement not to testify. Davis testified that it was his opinion that the petitioner "would not be the best witness" because of his "very severe criminal background, assaultive in nature." When asked whether he had a discussion with the petitioner about what evidence the state would be able to introduce concerning the petitioner's criminal

history, Davis responded: "Yes. I know we had that conversation. Specifically, I don't know what was actually said, but we would have covered what we thought how we expected the state to maneuver if he in fact did testify." After acknowledging that the victim also had a "very long criminal background" and that he introduced evidence of the victim's criminal background as extensively as he thought he could, Davis explained that he perceived the petitioner's criminal background to be problematic for his self-defense claim because he had been convicted of prior assaults.

Although Davis initially testified that he believed the petitioner had been diagnosed with an impulse control disorder, he then had his recollection refreshed when the petitioner's counsel showed him the report of a psychological evaluation of the petitioner that had been conducted in May, 2016, which reflected diagnoses of post-traumatic stress disorder and bipolar disorder. When asked what concerns he had regarding cross-examination of the petitioner, Davis responded: "Given the evaluation of what I think his mental state was and how he would function as a witness, I saw the potential for more damage to his story than anything else. So, it was certainly my advice that he consider not testifying and, in fact, he agreed and we did not testify." When asked whether he performed a dry run with the petitioner concerning his testimony, Davis responded: "A dry run, I'm going to say no. We spent [an] enormous amount of time preparing for it and going over what we could. So, our client understood what was going on and could assist us in his defense."

On cross-examination, the respondent's counsel asked Davis whether, because evidence of the victim's violent disposition had been introduced into evidence, the state would have been able to cross-examine the petitioner on his own criminal past had he testified. Davis responded: "[T]hat was certainly the fear, and

the prosecution was particularly zealous in this matter because they were actually responsible, the same individuals, for prosecuting [the petitioner] on the prior assault cases that you are speaking of." Davis testified that he explained to the petitioner that his criminal convictions could come out at trial, he went over how that could impact the petitioner's self-defense claim, and the petitioner was canvassed by the court on his decision not to testify.

The petitioner testified at the habeas trial to the following. He knew the victim as a coworker, and he was surprised when the victim entered the back door of the restaurant on the night of the incident. The victim asked him to come outside to talk with him and, once outside, asked the petitioner whether he had been "talking stuff" about him. A second man, unknown to the petitioner, appeared. The petitioner had left a broom in the back doorway to hold the door open and kicked it away to make sure that no one entered the restaurant. The petitioner noticed that the victim's speech was slurred and that he seemed to be intoxicated. After telling the victim to go home, the petitioner reentered the restaurant and looked for Malarkey's phone number. When he could not find it, he called his wife. The victim also reentered the restaurant using his key and yelled at the petitioner. The victim had his keys in his hands, and cocked his hand back, and the petitioner cut the victim. At that point, the petitioner feared that he would be "laid out on the floor" and that no one would find him until the morning. He thought that he could not run because the second person was waiting outside. Afterward, the petitioner was worried that he had killed the victim, and he wanted to save him. He left the razor on a table, followed the victim outside, and told the second person to drive the victim to the hospital. The petitioner then went back inside and called 911.

The petitioner testified that he had discussed with Davis the potential of testifying during the criminal trial but that "[Davis] said pretty much, he thinks it's wise that I don't testify because my past will come up, and I agreed." The petitioner testified that Davis did not talk with him about which convictions would be admissible into evidence. The following colloquy occurred between the petitioner's habeas counsel and the petitioner:

"Q. Well, if . . . Davis had advised you that there were limitations in terms of how far, generally, it can go back in cross-examination—

"A. Did not—

"Q. —of you—

"A. —even mention it.

"Q. Would that have impacted your decision to testify?

"A. Yeah. If it only stemmed—if it would only stem to that—yeah. I would have testified."

The petitioner testified that Davis did not have any discussions with him regarding how he would demonstrate the petitioner's subjective belief, in the absence of his testimony, that the victim was about to use deadly physical force upon him.

During closing argument, the habeas court inquired whether the parties would like the opportunity to brief the issue of the admissibility of "[a] defendant's prior assaultive convictions in a self-defense case." Both parties submitted posttrial briefs on July 22, 2024. In the petitioner's posttrial brief, he stated: "The petitioner does not dispute that . . . it is likely that the trial court would have admitted two prior convictions for attempted assault that occurred in 2004, whether as named offenses or unnamed felonies. On August 26, 2005, the petitioner was convicted and sentenced on one count

of attempted assault in the second degree and one count of attempted assault in the first degree to concurrent terms of five years.'' The petitioner further stated that ''[t]he sole additional conviction that would be conceivably admissible would be the defendant's 1999 conviction for larceny in the sixth degree. However, the trial court would have discretion in excluding evidence of such a conviction based upon remoteness alone.''[3]

The respondent argued in his posttrial brief that, although ''[i]t is unknown exactly what the trial court would have permitted in the underlying case,'' it was possible that the petitioner's prior convictions could have been introduced, especially the larceny conviction. The respondent maintained that ''convictions older than ten years are occasionally allowed,'' and, thus, the petitioner's two felony assault convictions from 2005 potentially could have been used for impeachment. The habeas court heard supplemental closing argument on July 31, 2024, during which the court admitted into evidence as a full exhibit a copy of the petitioner's criminal record without objection.

On August 5, 2024, the habeas court issued its memorandum of decision, in which it granted in part the petitioner's amended petition for a writ of habeas corpus. The court first considered the admissibility of the petitioner's prior convictions in order to determine whether Davis' advice that the petitioner should not testify based on his criminal history was accurate. The

---

[3] The petitioner argued that the following convictions and violations of probation would not have been admitted into evidence: ''(1) 1988 assault in the first degree; (2) 1992 probation violation; (3) 1987 assault in the first degree; (4) breach of the peace from 1990 arrest; (5) 1992 possession of narcotics; (6) 1994 assault on a peace officer; (7) 1998 disorderly conduct; (8) 1999 possession of narcotics; (9) 2012 breach of the peace; (10) 2013 failure to appear; (11) 2014 breach of the peace; and (12) several probation violations.''

court first considered the admissibility of the convictions pursuant to § 4-4 of the Connecticut Code of Evidence,[4] which permits the introduction into evidence of a homicide or assault victim's violent criminal record "to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide [or assault]." (Internal quotation marks omitted.) *State* v. *Johnson*, 351 Conn. 53, 73, 328 A.3d 143 (2025). The court stated that "there is no case in Connecticut permitting the introduction of a *defendant's* prior convictions for violence to prove that the victim was not the initial aggressor" and that any such request in this case to introduce evidence for this purpose would have been a matter of first impression. (Emphasis in original.) The court then stated that, even if the convictions would have been admissible, they remained subject to the trial court's gatekeeping function and weighing of their probative value compared to their prejudicial nature. Finally, the habeas court noted that "the issue of the initial aggressor was not before the jury. There was no instruction provided to the jury on initial aggressor." Accordingly, the court determined that any advice suggesting that

---

[4] Section 4-4 of the Connecticut Code of Evidence provides in relevant part: "(a) Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except that the following is admissible:

\* \* \*

"(2) . . . Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

Subsection (b) of § 4-4 delineates the methods by which the character of the victim may be proved: "In all cases in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of an opinion. In cases in which the accused in a homicide or criminal assault case may introduce evidence of the violent character of the victim, the victim's character may also be proved by evidence of the victim's conviction of a crime of violence."

the convictions would have been admissible for this purpose would have been incorrect.

The habeas court then turned to whether the petitioner's prior convictions would have been admissible pursuant to § 6-7 of the Connecticut Code of Evidence.[5] After considering the prejudice arising from the admission of the prior convictions of attempted assault in this prosecution, the probative value of an act of violence, and the remoteness of the convictions, the habeas court concluded that "it is clear that the facts of the underlying attempted assault convictions would be inadmissible, and there is a significant question as to whether either of them would come in as named felonies at all. The two prior convictions at issue were in 2005 and 1999, placing them both more than ten years in the past. [The petitioner's] 2005 conviction was used to charge him as a persistent dangerous felony offender, a charge to which he submitted a written plea of no contest. Nevertheless, both [of] his prior convictions were for attempted assaults, crimes identical to those charged. However, the record further reveals that the state filed a notice of intent to introduce evidence of uncharged misconduct on October 6, 2016, less than a

---

[5] Section 6-7 (a) of the Connecticut Code of Evidence provides: "For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider:

"(1) the extent of the prejudice likely to arise;

"(2) the significance of the particular crime in indicating untruthfulness; and

"(3) the remoteness in time of the conviction."

Section 6-7 (c) of the Connecticut Code of Evidence provides: "If, for purposes of impeaching the credibility of a witness, evidence is introduced that the witness has been convicted of a crime, the court shall limit the evidence to the name of the crime and when and where the conviction was rendered, except that (1) the court may exclude evidence of the name of the crime and (2) if the witness denies the conviction, the court may permit evidence of the punishment imposed."

week before the start of the trial. In that notice, the state notified the defense that it intended to offer evidence of an assault [the petitioner] committed on or about December 20, 1987, and for which he was convicted on May 20, 1988, some eighteen to nineteen years prior to this trial. There is no mention of any other misconduct sought to be introduced. The defense did not file a motion in limine precluding this evidence, nor an objection. There was also no hearing on the matter." (Emphasis omitted.)

The habeas court concluded that "[b]ased on prevailing Connecticut cases . . . Davis' advice that [the petitioner] should not testify because his lengthy prior record would be admitted at trial and negatively impact his claim of self-defense is erroneous. Even assuming that [the trial court] had, in fact, denied the motion in limine filed by the defense several months prior to the actual trial,[6] given [its] rulings on the admissibility of

_____

[6] The petitioner's criminal file contains a motion in limine, stamped as having been filed on July 1, 2016, with respect to the petitioner's prior criminal record. Therein, the petitioner represented that certain of his felony convictions were more than ten years old and lacked even minimal probative value so as to overcome their prejudicial effect. The petitioner further argued, inter alia, that certain of the convictions were for offenses similar or identical to that charged in the present case and, thus, would be highly prejudicial. The motion did not have annexed to it an order. See Practice Book § 41-6. There is a file entry that appears to be dated July 1, 2016, stating: "Motion in limine re [petitioner's] recorded history." The next line on the docket sheet states: "Motion in limine—Denied /s/ Seeley." There is no transcript dated July 1, 2016.

During supplemental closing argument before the habeas court, the issue of the file notation was discussed. The petitioner's counsel stated that the petitioner's motion in limine "wasn't pursued by . . . Davis." The court then inquired about the notation in the file that the motion was denied, and neither counsel could explicate the purported denial of the motion.

In its memorandum of decision, the habeas court referenced the state's October 6, 2016 notice of intent to offer evidence of the petitioner's 1988 assault conviction. The court stated in a footnote: "The clerk's file also reveals a motion in limine filed by the defense dated July 1, 2016, titled, 'Motion in limine re: defendant's recorded history.' This appears to be a motion seeking to preclude the state from eliciting evidence from its witnesses of [the petitioner's] criminal history. The clerk's file indicates a notation that the motion was denied, but there is no date associated with

the victim's convictions and the binding case law, at most [the petitioner] would have been impeached by virtue of his 2005 conviction and at worst it would have been limited to the fact that he was convicted of attempted assault in 2005. This one conviction alone is insufficient to advise a client to not testify and would not have the devastating impact that . . . Davis believed." (Emphasis omitted; footnote added; footnote omitted.) The court then credited the petitioner's testimony that "had . . . Davis advised him that any impeachment using his prior convictions would have been limited to the fact of conviction of either a named or unnamed felony, without getting into the circumstances of the incidents, he would have chosen to testify at the criminal trial."

Having found that Davis had rendered deficient performance, the habeas court determined that there was a reasonable likelihood of a different outcome of the criminal trial based on the petitioner's testimony. The court emphasized that, although the restaurant's video captured the interactions between the petitioner and the victim, the only evidence of the critical information regarding what was said during the interaction came from the victim. The petitioner's wife testified regarding phone calls with the petitioner both before and after the incident, during which she testified that he sounded worried and nervous. She further testified that she could hear the victim in the background and that he

that denial. The motion itself is devoid of any notation that it was ruled on, and it is not in any transcript. . . . Davis did not testify that he filed such a motion, it was heard by the court and then denied. The parties also agreed during supplemental closing argument that it was not clear what this referred to."

Additionally, in its memorandum of decision, the habeas court stated that the defense "did not file a motion in limine precluding this evidence . . . ." In a footnote in his reply brief, the respondent suggests that "[t]o the extent the habeas court found both that Davis did not file a motion in limine and that the file contains a motion in limine filed by him, that finding is clearly erroneous."

sounded angry, loud, and threatening. The victim testified that he was not there to argue or fight with the petitioner, he was not the initial aggressor, and he was de-escalating the situation. The habeas court identified two issues before the jury—the petitioner's subjective belief that his life was in danger and whether that was objectively reasonable. The court found: "The jury needed more than the video to find that [the petitioner] acted in self-defense. At the critical moment of the assault, only a very small portion of the victim's head can be seen on screen. [The petitioner] is not on screen, and almost no part of the victim's body is visible. The jury cannot tell from the video what the two were saying to each other, how close they were, whether [the petitioner] was advancing or retreating and other facts pertinent to self-defense. [The petitioner's] testimony in support of self-defense was critical to explain what is not shown by the video.

"The only way to put [the petitioner's] subjective belief that the victim was about to use deadly physical force on hi[m] was his own testimony. He gave no statement that could be admitted in lieu of his testimony. His credible testimony to this court provided a plausible alternate version of events and credibly explained his subjective fear that appears to be in harmony with the actions seen on the video. He testified that he was attempting to walk away from the victim while on the phone with his wife, expressing his fear to her. This was corroborated by her testimony. He testified before this court that the victim continued to pursue him and approach him in an aggressive manner and that he became afraid when the victim switched his keys to his dominant right hand and took a fighting stance.

"This is all information the jury needed to hear in order to properly and effectively evaluate his self-defense claim. While the jury would have been free to

disregard his version of events, the court cannot say that the state's case was so overwhelming that there is no reasonable probability of a different outcome. This was a 'he said-he said' case where the jury would have had to decide whether [the petitioner's] actions were justified by evaluating his credibility." The court found that, but for Davis' misadvice regarding the scope of admissibility of the petitioner's prior convictions, the petitioner would have testified and that his testimony creates a reasonable likelihood of a different outcome. Accordingly, the court granted the petition in part. On August 9, 2024, the court granted the respondent's petition for certification to appeal. This appeal followed.

I

We first set forth guiding principles of law as well as our standard of review, which are well settled. "In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . To satisfy the performance prong of the *Strickland* test, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . [T]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability suffi-
cient to undermine confidence in the outcome. . . .
[T]he habeas judge, as the trier of facts, is the sole
arbiter of the credibility of witnesses and the weight
to be given to their testimony. . . . The application of
the habeas court's factual findings to the pertinent legal
standard, however, presents a mixed question of law
and fact, which is subject to plenary review." (Citation
omitted; internal quotation marks omitted*.) Roberto A.*
v. *Commissioner of Correction*, 229 Conn. App. 104,
111–12, 325 A.3d 1192, cert. denied, 350 Conn. 935, 327
A.3d 384 (2024).

We also must set forth the well settled substantive
legal principles underlying a claim of self-defense. "The
rules governing the respective burdens borne by the
defendant and the state on the justification of self-
defense are grounded in the fact that [u]nder our Penal
Code, self-defense, as defined in [General Statutes]
§ 53a-19 (a) . . . is a defense, rather than an affirma-
tive defense. See General Statutes § 53a-16. Whereas
an *affirmative defense* requires the defendant to estab-
lish his claim by a preponderance of the evidence, a
properly raised *defense* places the burden on the state
to disprove the defendant's claim beyond a reasonable
doubt. See General Statutes § 53a-12. Consequently, a
defendant has no burden of persuasion for a claim of
self-defense; he has only a burden of production. That
is, he merely is required to introduce sufficient evidence
to warrant presenting his claim of self-defense to the
jury. . . . Once the defendant has done so, it becomes
the state's burden to disprove the defense beyond a
reasonable doubt. General Statutes § 53a-12 (a) . . . ."
(Emphasis in original; internal quotation marks omit-
ted.) *State* v. *Revels*, 313 Conn. 762, 778–79, 99 A.3d
1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451,
191 L. Ed. 2d 404 (2015).

"The substantive principles governing a defendant's claim of self-defense are well settled. Under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a jury must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) Id., 779.

Finally, the legal principles surrounding the right to testify are also implicated. "It is axiomatic that [i]t is the right of every criminal defendant to testify on his own behalf . . . and to make that decision after full consideration with trial counsel. . . . [A]lthough the due process clause of the [f]ifth [a]mendment may be understood to grant the accused the right to testify, the if and when of whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney. . . . [T]he presentation of testimonial evidence is a matter of trial strategy. . . . The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . . [T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . ." (Citations omitted; internal quotation marks omitted.) *Saez* v.

*Commissioner of Correction*, 168 Conn. App. 241, 247–48, 145 A.3d 384, cert. denied, 323 Conn. 933, 150 A.3d 685 (2016).

## II

The respondent claims on appeal that the habeas court improperly determined that Davis had rendered ineffective assistance with respect to purported misadvice regarding the admissibility of the petitioner's prior convictions if he were to testify in support of his claim of self-defense.[7] We agree that the habeas court improperly concluded that Davis' advice necessarily fell below

[7] The respondent also claims that the habeas court improperly decided a claim that the petitioner did not plead in his amended petition. Specifically, the respondent contends that the petitioner's allegation that Davis "fail[ed] to adequately discuss the legal elements of self-defense, in light of the evidence presented during the petitioner's criminal trial, with the petitioner prior to the petitioner electing to not testify," did not include within it the issue of whether Davis had misadvised the petitioner on the admissibility of his prior convictions. We are not persuaded.

"The petition is in the nature of a pleading . . . . [T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the [habeas] court's interpretation of the pleadings therefore is plenary. . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the [petition] is insufficient to allow recovery." (Internal quotation marks omitted.) *Roberto A.* v. *Commissioner of Correction*, supra, 229 Conn. App. 109. Reading the relevant claim in the petition broadly and realistically, we conclude that the issue raised, whether Davis rendered ineffective assistance by failing to discuss with the petitioner the legal elements of self-defense in light of the evidence presented during the criminal trial, included within it the issue of whether Davis' advice regarding the admissibility of the petitioner's convictions was reasonable.

Moreover, the habeas court asked the petitioner's counsel during closing argument whether his claim was that Davis "did not properly advise [the petitioner] and, had he done so, then [the petitioner] would have testified?" The petitioner's counsel responded in the affirmative, and the court again clarified: "[I]f I remember correctly, the testimony from [the petitioner] was, the only circumstance, I guess, under which he would have testified is, if . . . Davis had properly explained to him that only certain convictions would come in." The petitioner's counsel again responded in the affirmative.

the minimal constitutional standard required by the sixth amendment to the United States constitution. We also agree that the habeas court improperly concluded that the petitioner demonstrated a reasonable probability that, but for Davis' advice, the result of the proceeding would have been different.

A

First, the respondent contends that the habeas court improperly determined that Davis had rendered deficient performance. The respondent argues: "[T]o the extent that Davis may have advised the petitioner that his convictions could be admitted to impeach him, or that he risked opening the door to discussion of such convictions, such advice was correct." We conclude that the petitioner failed to demonstrate that Davis' advice regarding the petitioner's decision not to testify was constitutionally deficient.

The following additional legal principles are relevant. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within

The respondent's counsel did not alert the court that he objected to that construction of the petitioner's claim. Thus, the habeas court was not placed on notice of the respondent's position. See *Robles* v. *Commissioner of Correction*, 169 Conn. App. 751, 763, 153 A.3d 29 (2016), cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Miller* v. *Commissioner of Correction*, 154 Conn. App. 78, 87–88, 105 A.3d 294 (2014), cert. denied, 315 Conn. 920, 107 A.3d 959 (2015).

The respondent maintains in his brief that this court must entertain the range of possible reasons that Davis advised the petitioner not to testify because "[t]he evidence presented at the habeas trial never established Davis' specific rationale for his advice. Davis could not recall how he advise[d] the petitioner, and . . . [t]he petitioner never testified as to which mechanism Davis believed any or all of the convictions would be admissible." In reviewing the respondent's claim, we are mindful of the well established proposition that "a reviewing court is required not simply to give [counsel] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he or she] did." (Internal quotation marks omitted.) *Coltherst* v. *Commissioner of Correction*, 208 Conn. App. 470, 478, 264 A.3d 1080 (2021), cert. denied, 340 Conn. 920, 267 A.3d 857 (2022).

We consider the respondent's first proffered potential basis for Davis' advice that the petitioner's convictions could have been admitted into evidence, namely, that the petitioner, in his testimony, might open the door to admission of the prior convictions. "Although [e]vidence that a criminal defendant has been convicted of crimes on prior occasions generally is not admissible . . . [w]hen . . . a party opens the door to a subject that pertains directly to the credibility of the witness, he does so at his own risk. . . . In such cases, the rule is that a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the

same subject. . . . Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . The doctrine of opening the door cannot, of course, be subverted into a rule for injection of prejudice. . . . The trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter, and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence. . . . [I]n making its determination, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal." (Internal quotation marks omitted.) *State* v. *Solomon*, 141 Conn. App. 270, 278–79, 60 A.3d 1039, cert. denied, 308 Conn. 939, 66 A.3d 881 (2013).

The respondent maintains that advice based on a concern that the petitioner inadvertently might respond to a question in a manner opening the door to his prior convictions was reasonable. See, e.g., *State* v. *Griggs*, 288 Conn. 116, 140, 951 A.2d 531 (2008) (where defendant testified that he had only " '[a] couple' " of domestic violence convictions and had never been engaged in any kind of physical assault, trial court did not abuse its discretion in concluding that defendant opened door to evidence of his four domestic violence convictions involving assaultive or threatening behavior); *State* v. *Solomon*, supra, 141 Conn. App. 281 (where defendant, on direct examination, attempted to portray himself as peaceful, nonviolent man, after turning his life around following one time criminal conviction in 2003, trial court did not abuse its discretion when it allowed state to attempt to challenge inference during cross-examination with evidence of prior assault conviction and facts related thereto); *State* v. *Phillips*, 102 Conn. App. 716,

734, 927 A.2d 931 (where defendant testified to unfamiliarity with court procedures, court did not abuse its discretion in permitting state to ask about defendant's prior experiences in failing to appear for scheduled court date), cert. denied, 284 Conn. 923, 933 A.2d 727 (2007).

We agree with the respondent that advice based on a potential concern that the petitioner might open the door to admission of his prior convictions falls within the range of reasonable professional assistance. The habeas court noted that Davis had concerns about the petitioner being cross-examined, specifically, "given the evaluation and [the petitioner's] mental state, [Davis] saw the potential for more damage from testifying." As the court recognized, Davis testified that the petitioner had been evaluated and diagnosed with post-traumatic stress disorder and bipolar disorder.

The petitioner responds that, because Davis did not do a "dry run" of the petitioner's testimony, any concern about opening the door would have been speculative. We disagree. Although Davis acknowledged that he did not do a "dry run," he testified that "[w]e spent [an] enormous amount of time preparing for it and going over what we could. So, our client understood what was going on and could assist us in his defense." Thus, we decline to dismiss the concern as speculative.

The respondent also maintains that Davis properly advised the petitioner that his prior convictions could be admitted into evidence to impeach him. "[B]y exercising his fifth amendment right to testify on his own behalf, it is axiomatic that a defendant opens the door to comment on his veracity. It is well established that once an accused takes the [witness] stand and testifies his credibility is subject to scrutiny and close examination. . . . A defendant cannot both take the [witness] stand and be immune from impeachment. . . . An

accused who testifies subjects himself to the same rules and tests which could by law be applied to other witnesses." (Internal quotation marks omitted.) *State* v. *Ciccio*, 77 Conn. App. 368, 387, 823 A.2d 1233, cert. denied, 265 Conn. 905, 831 A.2d 251 (2003).

"It is well settled that evidence that a criminal defendant has been convicted of crimes on a prior occasion is not generally admissible. . . . There are, however, several well recognized exceptions to this rule, one of which is that [a] criminal defendant who has previously been convicted of a crime carrying a term of imprisonment of more than one year may be impeached by the state if his credibility is in issue. . . . In its discretion a trial court may properly admit evidence of prior convictions provided that the prejudicial effect of such evidence does not far outweigh its probative value. . . . [Our Supreme Court] has identified three factors which determine whether a prior conviction may be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time. . . . A trial court's decision denying a motion to exclude a witness' prior record, offered to attack his credibility, will be upset only if the court abused its discretion. . . . Those three factors have been incorporated in [the Connecticut] [C]ode of [E]vidence. Conn. Code Evid. § 6-7 (a). . . .

"There is no doubt that if evidence of a felony conviction is otherwise admissible, the name of the crime is generally also admissible." (Internal quotation marks omitted.) *State* v. *Swilling*, 180 Conn. App. 624, 656–57, 184 A.3d 773, cert. denied, 328 Conn. 937, 184 A.3d 268 (2018). Section 6-7 (c) of the Connecticut Code of Evidence provides in relevant part: "If, for purposes of impeaching the credibility of a witness, evidence is introduced that the witness has been convicted of a crime, the court shall limit the evidence to the name

of the crime and when and where the conviction was rendered, except that (1) the court may exclude evidence of the name of the crime . . . ." "As indicated in § 6-7, the court has discretion to admit the prior conviction as an unnamed felony. Factors to consider include whether the prior crime reflects directly on credibility and whether the prejudice inherent in the name of the crime outweighs the probative impeaching value. . . .

"[I]n evaluating the separate ingredients to be weighed in the balancing process, there is no way to quantify them in mathematical terms. . . . Therefore, [t]he trial court has wide discretion in this balancing determination and every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . The burden lies with the party objecting to the admission of evidence of prior convictions to demonstrate the prejudice that is likely to arise from its admission. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . .

"[P]rior convictions that are admissible for impeachment purposes may be segregated into two general categories. First are those crimes that by their very nature indicate dishonesty or tendency to make false statement. . . . Beyond the obvious violations such as perjury or false statement, we have recognized that crimes involving larcenous intent imply a general disposition toward dishonesty such that they also fall within this category. . . . Convictions of this sort obviously bear heavily on the credibility of one who has been convicted of them. The probative value of such convictions, therefore, may often outweigh any prejudice engendered by their admission.

"The second category involves convictions for crimes that do not reflect directly on the credibility of one who has been convicted of them. . . . The theory behind the admissibility of these convictions as evidence of credibility posits that conviction of a crime demonstrates a bad general character, a general readiness to do evil and that such a disposition alone supports an inference of a readiness to lie in the particular case. . . .

"Convictions of crimes that fall within this second category blemish the character of one so convicted. A juror might reasonably conclude that such a witness lacks to some degree the moral rectitude from which a [witness'] oath of honesty derives its credibility. Nevertheless, conviction of a crime not directly reflecting on credibility clearly lacks the direct probative value of a criminal conviction indicating dishonesty or a tendency to make false statement. Thus, the balance used to measure admissibility of prior convictions is weighted less heavily toward admitting the prior conviction when it involves a crime related only indirectly to credibility. . . . To avoid unwarranted prejudice to the witness, when a party seeks to introduce evidence of a felony that does not directly bear on veracity, a trial court ordinarily should permit reference only to an unspecified crime carrying a penalty of greater than one year that occurred at a certain time and place. . . . That prudent course [of permitting evidence of unnamed felony convictions] allows the jury to draw an inference of dishonesty from the prior conviction without the extraordinary prejudice that may arise from naming the specific offense. . . . Ultimately, [t]he trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions." (Citations omitted; internal quotation

marks omitted.) *State* v. *Swilling*, supra, 180 Conn. App. 657–59.

In the present case, the habeas court determined that the trial court, at most, would have permitted the introduction into evidence of a 2005 conviction for attempted assault and would not have allowed into evidence the facts underlying that attempted assault.[8] On appeal, the respondent argues that "[t]he trial court's exercise of discretion was never as guaranteed as the habeas court supposed."

The respondent identifies cases in which our appellate courts have determined that a trial court did not

---

[8] It is unclear why the habeas court determined that only one of the 2005 attempted assault convictions would have been admitted into evidence. The document entered into evidence before the habeas court indicates that there were two convictions for attempted assault, both of which indicate a disposition of guilty on August 26, 2005, and for which the petitioner was sentenced to concurrent five year terms of incarceration. The petitioner's criminal trial took place in October, 2016. In his posttrial brief to the habeas court, the petitioner identified the two convictions of attempted assault in 2005 and noted that he had been sentenced to a five year term of incarceration related to those convictions. Thus, the petitioner identified the two 2005 assault convictions as falling within the "relevant period . . . ." See *State* v. *Swilling*, supra, 180 Conn. App. 660 ("[t]he measuring point for a remoteness determination under § 6-7 of the Connecticut Code of Evidence is the date of conviction or the date of release from resulting confinement, whichever is later" (internal quotation marks omitted)). The petitioner argued that the trial court may have admitted the convictions as unnamed felonies to avoid undue prejudice. In the respondent's posttrial brief, he characterized the two assault convictions as "about eleven years old at the time of the trial . . . ."

During supplemental closing argument before the habeas court, the petitioner's counsel stated: "So, I believe the petitioner and [the respondent] agree there's really like three convictions that we're looking at here . . . as potentially admissible, and that would be obviously the two attempted assaults, one of which became the part B, referred to in the part B information, that occurred in 2000—convictions that occurred in 2005 for which he was sentenced to five years. *Obviously, he was released within the ten year window* for the purposes of—so, I mean, the question as to whether those would have come in as named offenses or unnamed felonies I think is a bit up in the air and unclear, given that the defense's then motion with respect to the prior convictions wasn't pursued by . . . Davis." (Emphasis added.)

In its memorandum of decision, the habeas court stated: "The two prior convictions at issue were in 2005 and 1999, placing them both more than ten years in the past." The respondent does not challenge this finding on appeal.

abuse its discretion in admitting evidence of prior convictions. See, e.g., *State* v. *Muhammad*, 91 Conn. App. 392, 400, 881 A.2d 468 (trial court did not abuse its discretion in admitting evidence of prior convictions of sexual assault and kidnapping that were approximately fifteen years old where defendant's release from confinement was within ten year benchmark), cert. denied, 276 Conn. 922, 888 A.2d 90 (2005). "[A] prior conviction which is more than ten years old may, under some circumstances, retain some probative value which is minimally sufficient to overcome any marginal prejudice, and may be admissible, therefore, without a wholly unreasonable exercise of a trial court's discretion." (Internal quotation marks omitted.) *State* v. *Ciccio*, supra, 77 Conn. App. 388–89. Although a prior conviction that is more than ten years old and not probative of veracity is less likely to be admitted into evidence; see *State* v. *Ortiz*, 343 Conn. 566, 588, 275 A.3d 578 (2022) ("unless a conviction ha[s] some special significance to untruthfulness, the fact that it [is] more than ten years old [will] most likely preclude its admission under our balancing test" (internal quotation marks omitted)); "[u]ltimately, [t]he trial court, because of its intimate familiarity with the case, is in the best position to weigh the relative merits and dangers of any proffered evidence. . . . This principle applies with equal force to the admissibility of prior convictions." (Internal quotation marks omitted.) *State* v. *Swilling*, supra, 180 Conn. App. 659.

The respondent contends that, "to the extent that the habeas court found that Davis should have divined how the court would have weighed the probative value of the petitioner's convictions against their potential for undue prejudice, he cannot be faulted for pursuing a more cautious route and anticipating that the court might have admitted the convictions had the petitioner testified." We agree with the respondent that, based on

the potential for the admissibility of the petitioner's prior convictions, primarily in the event that the petitioner opened the door to them, or in the secondary scenario that the court permitted the convictions as impeachment evidence, the petitioner has failed to demonstrate that Davis' advice regarding the decision not to testify was constitutionally deficient.[9]

B

The respondent also argues that the habeas court erred in finding that the petitioner satisfied the prejudice prong of *Strickland.* "To prevail on a claim of ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice; a failure to prove either deficient performance or prejudice is fatal to his or her claim." *Meletrich* v. *Commissioner of Correction*, 178 Conn. App. 266, 284, 174 A.3d 824 (2017), aff'd, 332 Conn. 615, 212 A.3d 678 (2019). Although we have determined that the habeas court erred in finding that the petitioner proved deficient performance, we also conclude that the habeas court erred in determining that the petitioner was prejudiced by Davis' advice.

"Our analysis of the prejudice prong requires us to determine the probable effect that counsel's alleged

[9] The respondent additionally contends that "whether the state could obtain admission of the petitioner's convictions if he presented violent conduct by [the victim] was an open question that some courts and commentators have answered affirmatively. . . . Some courts have held that, where a defendant claims self-defense, his prior convictions may be admissible to inform whether he was the initial aggressor in the charged offense . . . or, where the prior offense was sufficiently similar to the charged offense, to show the defendant's 'bent of mind' in engaging in the charged conduct or to rebut the claim of self-defense. . . . The respondent acknowledges, however, that other courts have held that admission of prior convictions for these purposes may amount to improper propensity evidence." (Citations omitted; footnote omitted.) We need not address whether Davis' advice not to testify reasonably would be supported by a concern that the trial court, addressing an issue of first impression, would have admitted the petitioner's prior convictions to refute any suggestion that the victim was the initial aggressor.

defective performance had under the circumstances of the case before the court. Thus, [t]o satisfy [this] prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. . . . The likelihood of a different result must be substantial, not just conceivable." (Internal quotation marks omitted.) Id., 285.

First, the respondent argues that the petitioner's testimony was cumulative of other evidence presented at the criminal trial. See, e.g., *Madagoski* v. *Commissioner of Correction*, 104 Conn. App. 768, 776, 936 A.2d 247 (2007) (prejudice was not established when trial counsel did not present witness testimony that would have been cumulative of other evidence at trial), cert. denied, 286 Conn. 905, 944 A.2d 979 (2008). We agree with the respondent that the petitioner's testimony would have been, to some extent, cumulative of the record already established at his trial. The jury had before it the audio recording of the 911 call that the petitioner had placed from the restaurant. During the call, the petitioner can be heard reporting that the victim came into the restaurant threatening the petitioner's life, that the petitioner tried to calm him down, that the victim went to attack the petitioner, and that the petitioner then attacked him first. The petitioner reported in the audio recording of

the 911 call that he cut the victim with a razor that he uses at work to clean the fryers. The jury also heard the testimony of the petitioner's wife that she heard fear in the petitioner's voice when he called her after his conversation with the victim. She testified that he sounded "shaky" and "worried." Although the petitioner's wife stated that she could not make out what the victim was saying, she described the victim's voice as very loud, angry, and threatening. Last, the restaurant's surveillance video depicted the victim following the petitioner around the restaurant kitchen and appearing to yell at him.

Second, the decision to have the petitioner testify at trial must be considered in light of all the evidence that was before the jury because "[t]he strength of the state's case is a significant factor in determining whether an alleged error caused prejudice to the petitioner." (Internal quotation marks omitted.) *Dupigney* v. *Commissioner of Correction*, 183 Conn. App. 852, 862, 193 A.3d 1274, cert. denied, 330 Conn. 942, 195 A.3d 1135 (2018). The jury had before it the video of the encounter. Therein, after the victim returns to the restaurant, the petitioner is seen moving around the restaurant, at times with his back to the victim. The victim can be seen shifting his keys from hand to hand. The petitioner then reaches out, grabs the victim by the neck or back of the head, pulls the victim's head closer to him, and cuts his neck with the razor blade. The victim runs out of the restaurant, bleeding from the neck, and the petitioner runs after him out the door.

On the basis of the foregoing, we conclude that the habeas court improperly determined that the petitioner demonstrated that he was prejudiced. To the contrary, the petitioner failed to sustain his burden of showing that a reasonable probability existed that the outcome of the criminal trial would have been different had Davis

advised him that the admissibility of his criminal convictions would have been limited had the petitioner testified.

The judgment is reversed only with respect to the habeas court's determination that Matthew Davis provided ineffective assistance of counsel by misadvising the petitioner regarding the scope of admissibility of his prior convictions and the case is remanded to the habeas court with direction to render judgment denying the petition as to that claim; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.